**David Michael HARDIN, Appellant–Third Party Defendant,**

v.

**Annette R. HARDIN, Appellee–Respondent.**

No. 41A05–0208–CV–384.

Court of Appeals of Indiana.

Sept. 11, 2003.

Jack Rogers, Rogers & Gesse, Franklin, IN, Attorney for Appellant.

Russell T. Clarke, Jr., Emswiller, Williams, Noland & Clarke, P.C., Indianapolis, IN, Attorney for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

David Michael Hardin ("David") appeals the trial court's order on the third-party complaint by his daughter-in-law Annette R. Hardin ("Annette") that found Annette was entitled to specific performance of his agreement to sell a specific parcel of real estate ("the land").

We affirm in part and reverse in part and remand.

### ISSUE [1]

Whether the trial court erred in ordering specific performance.

### FACTS

In 1995, Annette married David's son, Michael David Hardin ("Mike"). In early 1998, Annette and Mike began building their new house on land owned by David. Mike had talked to David earlier about purchasing the raw land, which was part of a larger tract owned by David. David agreed to sell to Mike and Annette the land, which consisted of more than eleven acres [2] for $4,000 per acre. David had the land surveyed, and Annette began working six days a week, from 56 to 72 hours weekly, to pay for the house. Mike engaged subcontractors and performed various work on the building project himself.

First, Mike and Annette had land cleared "to make a drive up to the land." (Apr. Tr. 13).[3] Then in May of 1998, they began building a bridge to access the land. Mike "made the forms" and "tied the rebar," and Mike and David together "worked on getting the concrete" supplied by the concrete company "down into the forms." (Apr. Tr. 15). When finished after several months, the bridge, 30–33 feet long and strong enough to carry construction vehicles and "semi trucks," crossed a creek in a deep ravine; it cost Mike and Annette $12,000. (May Tr. 5). Mike and Annette also spent $1,000 to have a trash "dump" area covered with fill and to clear other trash from the land. *Id.* at 4. They spent $3,000 to have electric lines run to the land; and $5,000 for water and telephone lines. Mike and Annette spent $500 for an architect to draw up blueprints for the house they wanted to build, and Mike obtained a building permit to build it. In September of 1999, they had concrete poured—a slab for the garage and walls for a 2,000 square foot walk-out basement; this work cost $28,000. Mike obtained a permit to install a septic system, and in October and early November of 1999, David assisted Mike "in putting the fingers for the septic system in." (Apr. Tr. 20).

---

1. We address the two issues raised by David within this single general issue.

2. References in the record indicate the property is either 11.4 or 11.6 acres.

3. We direct David's attention to Indiana Appellate Rule 28(A)(2), providing that transcript pages "shall be numbered consecutively regardless of the number of volumes the Transcript requires." As David's transcript pages are not so numbered, we must refer to them separately, to wit: "Apr. Tr." for the transcript from the April 22, 2002 hearing, and "May Tr." for the transcript from the May 6, 2002 hearing.

In mid-November of 1999, Mike informed Annette that he wanted a divorce. Annette called David, who confirmed that the sale price of the land, consisting of 11+ acres, was $4,000 per acre. A week later, on November 24, 1999, Annette went to David's house and "offered to at that time pay him for the land." (Apr. Tr. 37). David said he had been asking Mike "for a year now for money," and Annette replied that she "had no idea, and [she] said 'I'll pay you today.'" (May Tr. 7). David refused to take her payment.

On December 8, 1999, Mike filed a petition for dissolution of his marriage to Annette. On July 3, 2000, Annette filed a motion seeking to join David, asserting that he was "needed for just adjudication." (App.3). David moved to dismiss; the trial court initially ordered David joined; subsequently it set aside its order and conducted a hearing on the joinder issue. On February 13, 2001, the trial court heard testimony as to joinder, and on February 16, 2001, the trial court granted Annette's motion for joinder. David filed a motion to require Annette to file a third party complaint, and the motion was granted. Annette then filed a third party complaint, asserting that she, Mike, and David had entered into a verbal contract whereby she and Mike would purchase the land from David for $4,000 an acre; that she and Mike had spent more than $60,000 toward building a house on the site; and that David was no longer willing to sell the land at the agreed price but had asked a much higher price and added terms. Annette asserted that she "st[oo]d ready to perform the terms of the original verbal contract" and buy the land. (App.20). With his answer, David filed a counterclaim alleging that Mike and Annette had committed trespass by entering upon his land without his permission; that they had damaged his land; and he sought the restoration of the land "to its original condition" and damages. (App.27).

On April 22, 2002, the trial court convened a hearing to "only address the third party issue," to "deal with the third party claim." (Apr. Tr. 8). Mike's counsel stated that Mike and David had agreed that (1) David would not pursue a claim against Mike for damages done to the property, and (2) Mike would "make no claim to the property itself." (Apr. Tr. 7). Annette testified that in early 1998, Mike told her "that his dad agreed to sell us the land for four thousand dollars an acre." (Apr. Tr. 68). She further testified that she and Mike planned to include the cost of the land in the mortgage for the house. Annette testified as to the work she and Mike had completed on the land and the money paid for that work. She testified that David had either participated in or been present for much of the work.

David testified that he had never discussed any sale with Annette, but he also testified that "the agreement" was that "if *they* could access" the land by building a bridge, "then I'd sell *them* the property." (Apr. Tr. 83) (emphasis added). David also testified that he had "made a verbal offer" to sell Mike and Annette the land, but he believed the offer was not accepted because he "didn't get any money." (Apr. Tr. 88).

Mike testified that on at least one occasion he, David "and Annette" had discussed their buying the land from David. (Apr. Tr. 117). Mike also testified that he and Annette had discussed "that the purchase price of the land was to be rolled into a mortgage on the house." (Apr. Tr. 119).

On April 29, 2002, the trial court issued an order finding "that an oral agreement existed" between Annette, Mike, and David for Annette and Mike "to purchase" the land. (App.16). The trial court fur-

ther found that David had promised to sell the land to Annette and Mike; that the promise was made with the expectation that Annette and Mike would rely on it; that they were "induced to and did reasonably rely on the promise"; that their reliance was "definite and substantial" inasmuch as approximately $65,000 had been expended "based on said promise"; and "injustice would occur if the promise was not enforced." The trial court then held that the "oral agreement to sell the property" was "enforceable as a valid contract based on the equitable theory of promissory estoppel." (App.17). The trial court stated that it would proceed to trial to determine whether one of the various alternative remedies Annette sought[4] should be ordered and whether David was entitled damages on his claim for trespass.

On May 6, 2002, the trial court conducted a trial on "the contract issues," after Mike's and Annette's counsel had confirmed that the parties were "not going forward with the divorce at all today." (May Tr. 2). Annette testified she wanted to purchase "the property at the original contract ... price, four thousand an acre," and was "ready, willing and able" to pay that price. (May Tr. 8). She again described the improvements she and Mike had made to the land over 18 months as well as the expenses thereof. According to Annette, their work had transformed the land to a "gorgeous" area that was "clean," with trees, a creek and "rolling hills." (May Tr. 6). Annette also testified that since it had been poured in September of 1999, the foundation had deteriorated due to weather and would have to be redone. An expert for Annette valued the property in its current condition at $105,000. The expert also testified about the deterioration of the existing foundation and the problems of rebuilding it. The expert further testified that building a bridge across a stream required a permit from the DNR—the acquisition of which costs a minimum of $10,000—and without such a permit, the bridge is illegal and could be subject to fines of $1,000 daily.

David's witness Thomas Pfaehler, who was a general contractor, testified that it would cost "in excess of twenty thousand" dollars to make the "foundation usable." (May Tr. 74). David submitted an expert's valuation of the property as having a market value in the "range of $140,000–145,000." (Ex. 2). Mike testified that there was no permit from the DNR for the bridge.

On June 24, 2002, the trial court issued an order that found Annette was "entitled to specific performance in regard to the contract" between herself, Mike, and David.[5] (App.12). It ordered David "to sell" the land to Annette "for $4000 an acre" upon her paying him "the purchase price ... in full within thirty (30) days of the date of this order" and that Annette would "take possession of the property as is." (App.13, 12). It is this order that David appeals.

## DECISION

 Specific performance is an equitable remedy which the trial court may grant in its discretion. *Salin Bank and Trust Co. v. Violet U. Peden Trust*, 715 N.E.2d 1003, 1007 (Ind.Ct.App.1999), *trans. denied.* The grant of specific performance directs the performance of a con-

---

4. Specific performance, general damages for the value of improvements, or conversion damages.

5. It also "did not find for her on her claim of conversion" and found that because it was "ordering specific performance of the contract," her "claims for unjust enrichment and quantum meruit" were "moot." (App.12). And, it found "against [David] on his counterclaim." *Id.*

tract according to the terms agreed upon. *Id.* A party seeking specific performance of a real estate contract must prove that he has substantially performed his contractual obligations or offered to do so. *Id.* A trial court's decision to grant specific performance is reviewed for an abuse of discretion. *Id.* at 1008. When we conduct such a review, we do not reweigh the evidence. *Id.*

"The Statute of Frauds provides in pertinent part that '[n]o action shall be brought ... [u]pon any contract for the sale of lands ... [u]nless the promise, contract or agreement upon which such action shall be brought ... shall be in writing....'" *Brown v. Branch*, 758 N.E.2d 48, 50 (Ind.2001) (quoting Ind.Code § 32–2–1–1). "Nonetheless, even when oral promises fall within the Statute of Frauds, they may be enforced under the doctrine of promissory estoppel." *Id.* at 51. "Estoppel is a judicial doctrine sounding in equity," and there are a variety of estoppel doctrines. *Id.* at 51, 52. All are "based on the same underlying principle: one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other." *Id.* at 52.

Promissory estoppel is the estoppel doctrine upon which the trial court granted Annette relief. "This species of estoppel encompasses the following elements: (1) a promise by the promissor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Id.*

David first argues that the trial court abused its discretion in ordering that he sell the land to Annette because the verbal agreement "is insufficient to convert" the land, which is "titled in" David, "into marital property." David's Br. at 10. He cites *Vadas v. Vadas*, 762 N.E.2d 1234 (Ind. 2002), and *In re Marriage of Dall*, 681 N.E.2d 718 (Ind.Ct.App.1997). We find neither to be on point with the case before us. In *Vadas*, our supreme court held that the trial court erred when it included in its order of dissolution, "as a marital asset," the money which the divorcing parties had spent to occupy, maintain, and remodel a home actually owned by the husband's father—who was not a party to the action. In *Dall*, we held that the value of property that was lived in by the divorcing parties but titled in the wife's parents, who were not parties to the action, should not have been "included in the marital estate" in the dissolution order. 681 N.E.2d at 722. The order appealed here is not a dissolution order; it does not hold that the land is in the marital estate; and this case involves a complaint against a third-party defendant seeking to enforce an oral agreement upon the theory of promissory estoppel. Therefore, we do not find *Vadas* or *Dall* dispositive.

David also argues that based on his testimony that his agreement was with Mike only, Annette was "not a party" to the contract. David's Br. at 12. The trial court heard the testimony of the parties. It found that there was a contract between Annette, Mike, and David. In other words, the trial court found that Annette was a party to the contract. The evidence recounted in FACTS supports that conclusion. As we noted in *Salin Bank and Trust*, we do not reweigh the evidence on appeal. 715 N.E.2d at 1007.

Whether the trial court abused its discretion is the standard of review for an order of specific performance. *Id.* The trial court heard the evidence summarized above. It weighed and considered the testimony about the dealings of the parties in reaching the agreement, the money and work that Mike and Annette spent to im-

prove the property and begin building the house, and how David was always aware of these actions and even participated in making the improvements to the land. This evidence supports the trial court's conclusion that there was a promise to sell by David, made with the expectation that Mike and Annette would rely on it, which induced their reasonable reliance of a definite and substantial nature. *See Brown,* 758 N.E.2d at 52. The trial court also heard evidence about the current condition of the property, the varying estimates of its current worth, and the potential liabilities associated with the crumbling foundation and the non-permitted bridge. There is sufficient evidence to support the trial court's conclusion that here, "injustice can be avoided only by enforcement of the promise." *Id.* We find that the conclusion is not an abuse of discretion in this case.

However, we observe that what the trial court found was that there was a contract between Annette, Mike and David for Annette and Mike to purchase the land from David at a specified price. The trial court did not expressly find that Mike had made a judicial admission abandoning his interest in that regard. Therefore, the property should be conveyed, consistent with the contract, to both Mike and Annette for $4,000 an acre upon the payment to David of the purchase price in full. Accordingly, we affirm the trial court's order that David sell the property but reverse the order that the sale be to Annette alone.

Affirmed in part and reversed in part and remanded for proceedings consistent with this opinion.

SULLIVAN, J., and BAKER, J., concur.