Rita Ann **GABRIEL**, Appellant–Plaintiff,

v.

**WINDSOR, INC.**, Appellee–Defendant.

No. 02A03–0504–CV–148.

Court of Appeals of Indiana.

Feb. 28, 2006.

James A. Federoff, Jason M. Kuchmay, Federoff Law Firm, Fort Wayne, for Appellant.

Stephen H. Trexler, Clifford A. Holleran, Trevor J. Hobbs, Holleran & Trexler, Fort Wayne, for Appellee.

## OPINION

SHARPNACK, Judge.

Rita Ann Gabriel appeals the trial court's judgment in favor of Windsor, Inc. ("Windsor"). Gabriel raises four issues, which we consolidate and restate as:

    I.    Whether the trial court's judgment in favor of Windsor and denying Gabriel's counterclaim is clearly erroneous;

    II.    Whether the trial court's judgment granting specific performance is clearly erroneous; and

    III.    Whether the trial court's judgment in favor of Windsor in the amount of $2,383.41 is clearly erroneous.

Additionally, Windsor raises one issue, which we restate as whether Winsdor is entitled to receive appellate attorney fees due to Gabriel's procedural bad faith. We affirm in part, reverse in part, and remand.

The relevant facts follow. This litigation involves a dispute between Gabriel and Windsor concerning Windsor's construction of a residence for Gabriel. In October 2002, Gabriel entered into a contract to purchase Lot 5 in the Villas of LaCabreah and developed her house plans with her own architect. Windsor is the exclusive builder in the development.

Construction of the residence began in late November 2002. In the Spring of 2003, disputes about various things arose between the parties, including: (1) a leak in the basement; (2) the placement of a retaining wall; (3) the omission of a closet on the second floor; (4) the failure to install a heater in the garage; (5) discoloration of the concrete on the front porch; and (6) incorrect size and placement of the back patio and sidewalk. Beginning in June 2003, Gabriel was represented by counsel during negotiations with Windsor. As a result of the negotiations, Windsor agreed to repair the basement leak and provide a written warranty, construct a retaining wall between Lot 5 and Lot 4, remove and replace the sidewalk and patio, add a concrete step to the patio, replace the garage heater, and replace insulation in the basement. Windsor also agreed to

put a colored sealer on the front porch concrete and fix the closet issue.

On June 23, 2003, Gabriel, through her attorney, sent a letter to Windsor as follows:

As a follow up to our telephone conversation of last week, this letter is notice that Rita Gabriel desires to terminate the agreement dated October 30, 2002, for the purchase of Lot 5 in The Villas of LaCabreah. The reason for the termination is that the residential structure cannot be completed in a good workmanlike manner to the standard within the industry, to wit:

1. Water continues to leak into the basement even though attempts to correct this problem have been undertaken by you.

2. The basement leaking problem is exacerbated by the surface water and roof downspout water flowing from Lot 4 onto Lot 5. Because of the difference in height between these two lots and the small lot sizes, this drainage problem cannot be adequately corrected.

Naturally, there are numerous ways to accomplish this termination. I am glad to discuss each option available to both parties.

Appellant's Appendix at 222.

On July 18, 2003, Windsor filed a complaint for specific performance. Windsor alleged that it had completed construction of the residence and fully performed its obligations under the contract and that Gabriel had "refused to pay the Balance Due and refused to close the sale of the Residence and the Real Estate to Gabriel." *Id.* at 119. Gabriel filed an answer, affirmative defenses, and counterclaim. In her affirmative defenses, Gabriel alleged, in part, that Windsor had failed to construct the residence in accordance with the contract, causing a material breach, that Ga-

briel properly terminated the contract, and that Windsor had breached its express warranty. The counterclaim alleged that Gabriel had been damaged by Windsor's breach of the contract and its express warranty. Windsor later amended its complaint to add a claim for breach of contract and requested damages if the trial court did not grant its request for specific performance.

After a three-day bench trial, the trial court entered the following findings of fact and conclusions thereon:

### FINDINGS OF FACT

This cause was brought by Plaintiff, Windsor, Inc. ("Windsor") seeking specific performance of a contract to build a certain residence for Defendant, Rita Ann Gabriel, ("Gabriel"); or, in the alternative damages for breach of contract. Gabriel answered with affirmative defenses and a counter-claim seeking damages for breach of warranty and rescission of the contract.

This cause was tried to the Court on August 10, 11 and 12, 2004. Prior to the trial, the Court viewed the residence in question in the company of counsel for each party. At trial, Plaintiff appeared by Attorney Stephen H. Trexler, Jeffry A. Gilmore, Sr., its Chairman, and Gary W. Allen, its President. Gabriel appeared in person and by Attorney Thomas M. Gallmeyer. Evidence was presented by the parties. Plaintiff having filed a Request for Findings pursuant to Rule 52, Indiana Rules of Trial Procedure; and, the Court, having heard the evidence and reviewed the arguments of counsel as set forth in the trial briefs filed by the parties NOW FINDS:

1. The Plaintiff, Windsor, Inc. ("Windsor") is a corporation organized and

doing business pursuant to the laws of the state of Indiana with offices in Allen County, Indiana.

\*     \*     \*     \*     \*     \*

8. Gabriel holds an independent real estate broker license issued by the State of Indiana.

9. Gabriel is an MAI appraiser as designated by the Appraisal Institute and has been engaged in the business of appraising commercial and industrial real estate for several years.

10. Gabriel has considerable expertise and knowledge in real estate by reason of her professional license, designation, continuing education and professional activities.

\*     \*     \*     \*     \*     \*

13. On July 26, 2002, Gabriel and Windsor executed a Homesite Reservation whereby Windsor agreed to reserve Lot 5 for at least 30 days, during which time it was expected the parties would develop plans and specifications for a villa and enter into a construction agreement. Gabriel was told that Windsor could build a custom designed villa.

14. Prior to Gabriel's execution of the Homesite Reservation, Windsor had been made aware that storm water was draining onto Lot 5 from the adjoining Lot No. 4 ("Lot 4"), and was pooling on Lot 5, but did not disclose that information to Gabriel.

15. Windsor constructed the residence situated upon Lot number 4 in Villas of LaCabreah, which adjoins the Real Estate.

16. Lot 4, Villas of LaCabreah is next to Lot 5, and the grade of Lot 4 is higher than Lot 5.

17. Shortly after July 26, 2002, Gabriel employed Roy McNett to prepare custom plans for a villa to be constructed upon Lot 5 ("Villa"). Gabriel furnished Windsor certain plans for the Residence as prepared by Roy McNett, a designer of homes associated with Architectural Concepts, Inc., (Joint Exhibit DD) ("McNett Plans").

\*     \*     \*     \*     \*     \*

21. Windsor prepared a set of construction plans from the McNett Plans (Joint Exhibit EE) for review by Gabriel ("Original Layout Plans").

22. Various modifications and revisions of plans for the residence by Windsor were prepared by Windsor pursuant to various discussions between Enright and Gabriel ("Draft Plans").

23. Gabriel reviewed and approved various revisions to the Draft Plans during the discussions with Enright.

24. Cost of the Residence was a concern of Gabriel in her review and revision of the Draft Plans.

25. Gabriel was meticulous in her review of the Draft Plans for the Residence as well as in reviewing the details of the Residence as it was being constructed and frequently made comments concerning such details and various items she did not think complied with the plans and specifications for the Residence.

26. Gabriel asked Steve Enright, Windsor's representative, whether any changes had been made to the last version of the construction plans dated October 29, 2002, and

upon being told that no changes had been made, Gabriel initialed the preliminary construction plans dated October 30, 2002. On the 30th day of October, 2002, Gabriel affixed her initials on Draft Plans consisting of four (4) drawings of elevations, first floor plan, second floor plan and basement floor plan for the Residence (Joint Exhibit II).

27. Gabriel either reviewed, or had adequate opportunity to review, Joint Exhibit II before she initialed it.

28. The second floor plan in Joint Exhibit II does not contain a closet as do prior Draft Plans dated October 21, 2002 (Joint Exhibit EE) and October 29, 2002 (Joint Exhibit HH).

29. Between late August, 2002, and October 29, 2002, Gabriel and representatives of Windsor had numerous meetings with regard to finalizing the plans and specifications for the Villa.

30. On or about the 30th day of October, 2002, Windsor, as Builder and Seller, and Gabriel, as Buyer, entered into a certain "Building Construction Agreement," (Joint Exhibit A) including a "LaCabreah Villa Series—New Home Proposal" (Joint Exhibit B) (collectively "Construction Agreement"), whereby Windsor was to construct and convey to Gabriel a residence ("Residence") on real estate, located in Allen County, Indiana, commonly known as 333 Foxberry Lake Run, Fort Wayne, Indiana, and more particularly described as follows:

Lot number 5 in Villas of LaCabreah, according to the plat thereof, recorded in Plat Cabinet C, page 126 and recorded as Document No. 96–56103 in the Office of the Recorder of Allen County, Indiana ("Lot 5").

31. Pursuant to the Construction Agreement, Gabriel was to pay Windsor in specified installments the sum of Two Hundred Thirty Six Thousand Two Hundred Fifty One Dollars ($236,251.00) as consideration for the construction of the Residence and the conveyance of Lot 5 ("Contract Price").

32. The Construction Contract incorporated the Indiana Quality Assurance Builder Standards (Joint Exhibit D) and the Windsor Homes by Jeff Gilmore Warranty Documents which are express warranties with respect to the quality of the construction of the Residence ("Express Warranties") (Joint Exhibit BB).

33. On the 13th day of November, 2002, Gabriel affixed her signature immediately after the words "Approved by" on five (5) drawings consisting of elevations, first floor plan, second floor plan and basement floor plan for the Residence and dated same by her own hand (Joint Exhibit E) ("Plans").

34. As was the case with Joint Exhibit II, the second floor plan in Joint Exhibit E does not contain a closet as do prior Draft Plans dated October 21, 2002, (Joint Exhibit EE) and October 29, 2002 (Joint Exhibit HH).

35. In addition to the deletion of the closet on the second floor, the Plans set forth on Joint Exhibit E reflect a partial finish, or no trim, on the second floor of the Residence, a change from the prior Draft Plans.

36. The revisions to the second floor were made pursuant to discussions between Gabriel and Enright, and with Gabriel's approval.

37. The revisions to the second floor resulted in a cost savings to Gabriel of approximately six thousand dollars ($6,000.00) over the cost of the Residence were it to be constructed pursuant to the prior Draft Plans.

38. Gabriel either reviewed, or had adequate opportunity to review, Joint Exhibit E before she signed it and had the Plans for twenty-two (22) days prior to signing them.

39. On or about the 8th day of January, 2003, Gabriel affixed her signature immediately after the words "Approved by" on three (3) drawings consisting of cabinet plans and details ("Cabinet Plans") (Joint Exhibit F).

40. On or about the 8th day of January, 2003, Gabriel executed and delivered to Windsor an Additional Work Authorization No. 9443 amending the Plans and Specifications as noted therein and increasing the Contract Price by Seven Hundred Ten Dollars ($710.00) (Joint Exhibit G).

41. On or about the 14th day of January, 2003, Gabriel affixed her signature to the "Villas of LaCabreah Selection Sheet" consisting of three (3) pages of specifications for the Residence (Joint Exhibit H) ("Specifications").

\*     \*     \*     \*     \*     \*

[discussing Additional Work Authorizations]

55. All changes to the Contract Price, including the Additional Work Authorizations set forth above, are as set forth on the accounting (Joint Exhibit V) showing an increase in the Contract Price of Seventeen Thousand Eighteen and 45/100 Dollars ($17,018.45).

56. In late November of 2002, Windsor commenced construction of the Residence.

\*     \*     \*     \*     \*     \*

59. During construction of the Residence in 2003, Gabriel made numerous complaints to Windsor regarding various issues in the construction of the Residence which she felt were not in compliance with Contract Documents, including, but not limited to, discoloration of front porch concrete, adequacy of garage heater, length of certain kitchen cabinets, height of laundry room counter top, height of vanity in bathroom and other issues ("Construction Issues").

60. In March, 2003, Gabriel and Windsor discovered there was water in the basement of the Residence ("Basement Leak"). The basement leak was discovered near the wall that faces Lot 4.

61. The water from the Basement Leak, at its worst, only covered a portion of the basement floor.

62. The water seeped into the basement from the Basement Leak only when it rained, and then evaporated.

63. The spring of 2003 was abnormally wet and rainy and had the most rainfall in the past 100 years.

64. Butler Concrete Construction, Inc. was Windsor's subcontractor for the construction of the basement walls of the Residence.

65. Dan Butler is the President of Butler Concrete Construction, Inc. (collectively "Butler").

66. Allen sent a work order to Shirey and Butler to correct the Basement Leak.

67. Water was leaking into the basement through "wall ties," which are places in the concrete walls where wires that hold the concrete forms together ran through the walls and were broken off when the forms were taken down.

68. Leaks through wall ties are not uncommon in residential construction before the final grade of the lot is completed.

69. Butler repaired two wall ties and thought he had fixed the Basement Leak.

70. After the two wall ties were fixed, the Basement Leak continued.

71. Another wall tie was found leaking behind a stud on the basement wall and it was repaired.

72. Butler and Shirey initially reasonably believed that patching the wall ties solved the Basement Leak.

73. Proper drainage is essential to assuring a dry basement as concrete is not in and of itself a water proof barrier.

74. Good drainage is accomplished by installing in gravel, on either side of the basement wall footers, tiles to drain and channel water to the sump so the water will not stand against the concrete and through the grading of the dirt surrounding the Residence to direct water away from the Residence.

75. The grade of Lot 5 was designed so that water drained to a pond in back of the Residence and to the street at the front of the Residence.

76. Despite the patching of the wall ties, the Basement Leak persisted.

77. On or about the 10th day of April, 2003, the Allen County Building Department issued a Certificate of Occupancy for the Residence (Joint Exhibit Y).

78. Windsor has obtained and tendered to Gabriel a commitment for title insurance for the Real Estate showing Windsor has marketable title to the Real Estate (Joint Exhibit Z) and a Certificate of Survey for the Real Estate (Joint Exhibit AA).

79. On April 14, 2003, Gabriel arranged a meeting at the Villa of the following individuals: Gary Allen from Windsor; Ralph Holler, the owner of Lot 4; Gabriel's landscape architect; and, a structural engineer employed by Gabriel. The purpose of the meeting was to inspect the leaking basement wall, determine the cause of the leaking, and determine the proper cure. During that meeting, Windsor's representative assured Gabriel that there was nothing wrong with the basement wall but proposed, for the first time, that a retaining wall be constructed upon Lot 5 to control the storm water drainage from Lot 4 and Lot 5. After this meeting, Windsor made no further attempts to cure the leaking basement wall until late June, 2003.

80. On or about April 14, 2003, a meeting was held at the Residence to discuss the Basement Leak.

81. At this meeting, McLaine and Allen discussed the Basement Leak,

and it was agreed it was caused by water standing against the wall, that grading should fix it, and that if it didn't, Windsor would have to do whatever it took to fix it.

82. In villa projects where the side set-back restrictions are small, retaining walls are sometimes used to assist drainage.

83. On or about May 6, 2003, Gabriel inspected the Residence and signed a Repair List or "final punch list" of even date (Joint Exhibit RR) ("Punch List").

84. The Punch List was prepared by Shirey to include items specified by Gabriel after his prior independent inspection of the Residence and an inspection of the Residence in the company of Gabriel where Shirey and Gabriel discussed the construction of the Residence to date.

85. The purpose of the Punch List was to finally and completely document all items which needed to be completed by Windsor in the construction of the Residence pursuant to the Contract Documents.

86. Gabriel understood the purpose of the Punch List was to be the final list of all items which needed to be completed by Windsor in the construction of the Residence pursuant to the Contract Documents.

87. Listed on the Punch List above Gabriel's signature were the following items:

1. Tint front porch concrete;
2. Install larger garage heater with wall control;
3. Pour rear patio and sidewalk / also public walk;
4. Finish grade and seed;
5. Irrigation system for yard;
6. Finish upstairs bath (when owner gets vanity);
7. Install front porch and post light (after grading);
8. Install retaining wall;
9. Paint above master vanity/also knock rough spots on ceiling by tub and paint touch up.

88. After Gabriel's signature is the phrase "still leaks—possibly at floor."

89. This reference to "leaks" was written by Shirey at his suggestion as Gabriel did not mention it after Gabriel signed the Punch List, and referred to the Basement Leak.

90. The Construction Documents never included a retaining wall along the eastern boundary of the Real Estate, although it was included on the Punch List.

91. Starting on or before June 3, 2003, Gabriel was represented in discussions and negotiations with Windsor with respect to the Basement Leak and Gabriel's complaints regarding the construction of the Residence by Attorney Thomas M. Gallmeyer ("Gallmeyer").

92. On or about June 3, 2003, Gabriel, Gallmeyer and Allen met at the Residence to discuss the Basement Leak and Gabriel's other complaints.

93. When Gallmeyer participates in meetings of this nature, it is his practice to document items discussed and agreements reached in a letter to the party with whom the discussions were had and the agreements reached.

94. No agreement was reached at the June 3, 2003 meeting regarding any remedy for the discolored concrete on the front porch. Windsor had offered to tint the front porch concrete as specified in the Punch List, but Gabriel insisted on tile.

95. On June 4, 2003, Gallmeyer wrote Allen a letter (Joint Exhibit VV) indicating Gabriel was going to get estimates for paving material for the front porch and confirming their agreement that Windsor:

10. Will construct a retaining wall with drainage pipe on the boundary between Lot 5 and Lot 4;

11. Remove a sidewalk and replace it with one approved by Gabriel and her landscape architect;

12. Add a concrete step from the rear sliding door to the patio;

13. Coordinate with Gabriel's landscape architect in the placement of the new sidewalk;

14. Provide a written warranty regarding a dry basement.

96. On June 6, 2003, Gallmeyer wrote Allen a letter (Joint Exhibit WW) wherein he advised of the cost of paving materials and that closing would be scheduled "as soon as you can get me the title work" and confirmed other agreements reached at the June 3 meeting which were omitted from his letter of June 4 wherein Windsor would:

15. Remove the concrete patio and replace it with one in the configuration and location directed by Gabriel and her landscape architect;

16. Replace the heater in the garage;

17. Replace insulation on the basement walls.

97. The Basement Leak continued and Butler and Allen determined that it would be necessary to excavate the exterior of the basement wall where the Basement Leak occurred to find the source of the Basement Leak.

98. The extremely wet weather prevented excavation of the basement wall until June 20, 2003.

99. Due to the extremely wet weather, Windsor was unable to complete the grade of Lot 5 in the spring of 2003, which allowed water to stand against the concrete basement wall where the Basement Leak occurred, and was not reasonably able to complete the final grading of Lot 5 until late June of 2003.

100. When the excavation of the basement wall was undertaken, Butler found that the drainage tile on the outside of the basement wall where the Basement Leak occurred was crushed.

101. The crushed tile prevented water from efficiently draining into the sump and resulted in it standing against the basement wall, causing the Basement Leak.

102. The crushed tile was replaced, the exterior of the basement wall was re-coated with a moisture resistant coating, a vapor barrier of visquine was applied, a second re-coating was applied and additional gravel was placed around and above the replacement tile ("Final Repair").

103. The Final Repair and the grading of Lot 5 fixed the Basement Leak.

104. The basement of the Residence did not leak after the Final Repair.

105. Any moisture that may have been observed in the basement of the Residence after the Final Repair was water that had started to seep through the basement wall before the Final Repair and continued to seep in after the Final Repair or was the result of condensation as the concrete cured out.

106. Windsor generally considers, and determined as respects the Residence, that any water or leak in a basement is unacceptable, not consistent with its internal quality standards and its obligations pursuant to the Indiana Quality Assurance Builder Standards (Joint Exhibit D), and that same would be covered under Windsor's Express Warranties applicable to the Residence, (Joint Exhibit BB).

107. Subsequent to Gallmeyer's letters of June 4, 2003, and June 6, 2003, Windsor continued to perform its obligations pursuant to the Contract Documents and the agreements documented by such letters.

108. Gabriel gave Windsor notice of termination ("Notice of Termination") of the Construction Agreement on or about June 23, 2003 (the date upon which Windsor had agreed to complete construction of the residence, per the Construction Agreement), by means of a letter from Gallmeyer to Allen (Joint Exhibit NNN), which recited as grounds for termination the following:

18. "Water continues to leak into the basement even though attempts to correct this problem have been undertaken by you;" and,

19. "The basement leaking problem is exacerbated by the surface water and roof downspout water flowing from Lot 4 onto Lot 5. Because of the difference in height between these two lots and the small lot sizes, this drainage problem cannot be adequately corrected."

109. Subsequent to the Notice of Termination, a retaining wall was constructed on Lot 5, but not in the location agreed upon.

110. The wall was removed by Windsor as it was entirely on Lot 5 and not on the boundary line between Lot 5 and Lot 4.

111. After removing the retaining wall, Windsor completed the grading of the Lot 5 and installed an underground drain into which water from Lot 5 and Lot 4 is discharged as referenced in Gallmeyer's letter of June 4, 2003, which drain will not affect Gabriel's enjoyment of the Residence.

112. The retaining wall is not necessary to the adequate drainage of Lot 5 and Lot 4.

113. The retaining wall was not required by the Contract Documents.

114. The sidewalk to be removed pursuant to Gallmeyer's letter of June 4, 2003, was removed for the excavation necessary for the Final Repair.

115. The sidewalk was not replaced and the patio was not replaced as set forth in Gallmeyer's letter of June 4, 2003, due to the Notice of Termination and Gabriel's refusal to perform her obligations pursuant to the Contract Documents.

116. The patio and sidewalk was [sic] designed by Gabriel's landscape architect [and] were not included in the price of the Residence as per the New Home Proposal (Exhibit B) of Contract Documents and Gabriel would be obligated to pay additional costs were they installed.

117. Windsor replaced the garage heater as provided in Gallmeyer's letter of June 6, 2003, even though it was not included in the Construction Documents other than as a note on the Plans.

118. Windsor did not finish the upstairs bath due to the Notice of Termination and Gabriel's refusal to perform her obligations pursuant to the Contract Documents.

119. Pursuant to the Construction Contract, Gabriel has paid Windsor One Hundred Eighty Five Thousand Five Hundred Thirty Nine Dollars ($185,539.00).

120. There remains due and owing Windsor from Gabriel pursuant to the Construction Contract as adjusted by the Change Orders the sum of Sixty Seven Thousand Seven Hundred Thirty and 45/100 Dollars ($67,730.45) ("Balance Due") calculated as follows.

| | |
|---|---|
| Original Contract Price: | $236,251.00 |
| Extras and Change Orders: | 17,018.45 |
| Total Contract Price | $253,269.45 |
| Paid by Gabriel: | (185,539.00) |
| Balance Due Windsor | $ 67,730.45 |

121. There is no longer a water leak in the basement at the Residence.

122. Unrebutted evidence presented by Gabriel's expert witness, Betty Sue Rowe, established that the Residence is marketable and compatible with other villas in the LaCabreah development.

### CONCLUSIONS OF LAW

1. The law is with the Plaintiff and against the Defendant.

2. The Construction Agreement (Joint Exhibits A–B), Indiana Quality Assurance Builder Standards (Joint Exhibit E), Express Warranties (Joint Exhibit BB), Plans (Joint Exhibit E), Cabinet Plans (Joint Exhibit F), Specifications (Joint Exhibit H) and the Additional Work Authorizations (Joint Exhibits G, I–U, W) (collectively "Contract Documents") constitute the contract for the construction of the Residence.

3. Plaintiff, Windsor, Inc., ("Windsor") is entitled to a judgment of specific performance to compel Defendant Rita Ann Gabriel ("Gabriel"), to purchase a residence constructed by Windsor for Gabriel based upon plans she had custom designed for her ("Residence") pursuant to the "Building Construction Agreement," (Joint Exhibit A) including a "LaCabreah Villa Series—New Home Proposal" (Joint Exhibit B) (collectively "Construction Agreement").

4. Windsor is entitled to specific performance for the same reason that Gabriel's affirmative defenses and counterclaim alleging breach of contract and warranty must fail; i.e., the evidence presented at trial is undisputed that: (1) Windsor has completed construction of the Residence; (2) Gabriel has refused to close the purchase and sale of the Residence; and (3) Windsor never repudiated its obligations to complete the Residence and resolve the leak in the basement.

5. Windsor did not deny there were certain problems in the construction of the Residence, but the Construction Issues were either waived or compromised to accommodate Gabriel to the extent they were not set forth on the final Punch List. Certainly, the most obvious and critical problem was water in the basement of the Residence ("Basement Leak"), which was eventually resolved by Windsor after it had a reasonable opportunity to identify the problems causing the Basement Leak and to fix these problems. The other Construction Issues were either resolved by Windsor or waived by Gabriel.

6. The Basement Leak was not such that it would have prevented Gabriel from occupying the Residence and did not make the Residence uninhabitable.

7. By April 10, 2003, Windsor substantially completed construction of the Residence to the point where it could be practically and legally occupied by Gabriel well within the 180 working day time frame specified in the Building Construction Agreement.

8. There was no evidence that Windsor at any time refused to perform its obligations. In fact, Windsor's obligations were reaffirmed by the letters Gallmeyer sent on June 4th and 6th of 2003.

9. Subsequent to Gallmeyer's letters of June 4, 2003 and June 6, 2003, Windsor continued to perform its obligations pursuant to the Contract Documents and the agreements documented by such letters.

10. While there is conflict between the testimony of Gallmeyer and Allen with respect to the nature of a repair that was being contemplated by Windsor (Gallmeyer denies there was discussion of the particulars of the proposed repair in a phone call with Allen), this conflict need not be resolved by the Court as whether or not Windsor advised Gallmeyer of the particulars of the proposed repair is wholly irrelevant.

11. What is relevant under the applicable law is that Windsor did not in this phone conversation or at any other time in any way repudiate its obligations pursuant to the Construction Documents or Gallmeyer's letters.

12. It was Gabriel's burden to prove that Windsor repudiated its obligations and Gabriel wholly failed to meet this burden of proof.

13. Absent such a repudiation, case law is clear that Gabriel may not terminate her obligations under the Construction Agreement and rescind the purchase of the Residence.

14. Windsor did not commit a material breach of the Construction Agreement prior to Gabriel's purported termination.

15. Even if Windsor committed a material breach, Gabriel's performance of the Construction Agreement is not excused.

16. There was no evidence that Windsor was not timely in its performance of its obligations pursuant to the Construction Agreement. Even given the extensive change orders, Windsor had substantially completed the Residence by the 10th day of April, 2003, the date the Allen County Building Department issued a Certificate of Occu-

pancy for the Residence (Joint Exhibit Y).

17. Windsor was entitled to a reasonable opportunity to cure the Basement Leak. In addition to the Restatement (Second) of contracts, Indiana case law supports the proposition that even if Windsor had committed a prior material breach of the Construction Agreement or breached any implied warranty of habitability by reason of the moisture problem in the basement, Windsor was entitled to a reasonable opportunity to cure the moisture problem in the basement of the Residence. *Wagner Constr. Co., Inc. v. Noonan*, 403 N.E.2d 1144, 1150 (Ind.Ct.App. 1980); *Jordan v. Talaga* 532 N.E.2d 1174, 1186 (Ind.Ct.App. 1989); *Deckard v. Ratcliff,* 553 N.E.2d 523 (Ind.Ct.App.1990).

18. Windsor did not have a reasonable opportunity to fix the Basement Leak until the Final Repair and the grading of Lot 5 due to the abnormally wet weather.

19. Windsor is obligated to replace the insulation on the basement wall and finish the upstairs bathroom if Gabriel provides a vanity, and to tint the concrete on the front porch if Gabriel provides a color selection.

20. Although the drain tile installed on Lot 5 which services both Lot 5 and Lot 4 will not impair Gabriel's enjoyment of the Residence, Windsor should convey to the owners of Lot 4 an easement for drainage into said tile so that the issue is wholly resolved.

21. The Basement Leak and any other leaks arising in the basement of the Residence are within the terms and conditions of the Express Warranties as if fully identified and set forth therein as the responsibility of Windsor, subject to the further terms and conditions of such Express Warranties;

22. Although Windsor offered to issue a written warranty with respect to the Basement Leak, same is not necessary as it was admitted by Windsor and will be ordered that the Basement Leak is covered under the Express Warranties which will cover the Residence after closing.

23. Windsor is entitled to judgment on its complaint against Gabriel.

24. Gabriel is not entitled to judgment against Windsor on her counterclaim.

### *JUDGMENT*

1. The Court finds for Windsor and against Gabriel on plaintiff's Complaint.

2. Gabriel is hereby ordered to specifically perform and complete her obligations to purchase of Lot 5 and the Residence within thirty (30) days of the date of this Order and Judgment by the payment to Windsor of the sum of Sixty Seven Thousand Seven Hundred Thirty and 45/100 Dollars ($67,730.45) ("Balance Due") at a closing to be held at the offices of the title company chosen by Windsor at a date and time to be determined by counsel for the parties, or if they cannot agree, on December 10, 2004 at 9:00 a.m. ("closing");

3. Upon receipt of such payment, Windsor shall convey Lot 5 by Corporate Warranty Deed to Gabriel subject to the drainage easement as

referenced below and furnish the customary Closing Affidavit;

4. The Closing shall in all respects conform to the requirements of the Building Construction Agreement, the Contract Documents and standard real estate practices in Allen County, Indiana, and to the extent same conflict with the terms of this Order or Judgment, the terms of this Order or Judgment shall control;

5. That Windsor have and recover judgment against Gabriel in the amount of Two Thousand Three Hundred Eighty–Three and 41/100 Dollars ($2,383.41), as well as:

a. Interest on the Balance Due at eight percent (8%) per annum from and after June 1, 2003, until date of Closing at $11.13 per day;

b. Insurance accruing from and after July 26, 2004, at $1.55 per day until date of Closing;

6. The Court finds against Gabriel and for Windsor on Gabriel's counterclaim, and Gabriel shall take nothing by way of it.

7. Windsor and Gabriel shall file a Closing Statement signed by each of them with the Court upon the conclusion of the Closing.

8. Costs of this action are assessed to Gabriel; costs paid.

Appellant's Appendix at 8–19 (emphasis in original).

Gabriel filed a motion to correct error, which the trial court granted in part. The trial court's order on the motion to correct error deleted paragraph 61 of the judgment, deleted everything after the word "Leak" in paragraph 81, deleted paragraph 86, deleted paragraph 104, and deleted the phrase "as referred in Gallmeyer's letter

of June 4, 2003" in paragraph 111. *Id.* at 20–23.

The trial court entered findings of fact and conclusions thereon pursuant to Gabriel's request and Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind.2000), *reh'g denied.* In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard,* 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind. 1999).

I.

The first issue is whether the trial court's judgment in favor of Windsor and denying Gabriel's counterclaim is clearly erroneous. Gabriel argues that numerous of the trial court's findings are clearly erroneous because she properly rescinded the contract due to Windsor's material breaches and its refusal to perform its obligations. Specifically, Gabriel challenges Findings of Fact No. 69, 70, 71, 72, 98, 99, 103, and 121, and Conclusions of Law No. 8, 9, 11, 12, 13, 14, 15, 16, and 18. According to Gabriel, the material breaches included Windsor's failure to correct:

(1) the leak in the basement; (2) the retaining wall; (3) the closet in the upstairs bedroom; (4) the heater in the garage; (5) the incorrect patio and sidewalk; and (6) the discolored concrete on the front porch.[1]

Before addressing Gabriel's claims of error, we pause to emphasize the standard of review here. As noted above, findings of fact are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Quillen,* 671 N.E.2d at 102. Moreover, we cannot reweigh the evidence and must consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon,* 711 N.E.2d at 1268. Many of Gabriel's challenges to the findings of fact are simply requests that we reweigh the evidence, which we cannot do. In most instances, the record contains facts to support the trial court's findings of fact that she challenges. With this in mind, we will address Gabriel's claims.

■■■ A request for rescission is addressed to the sound discretion of the trial court. *Barrington Mgmt. Co. v. Paul E. Draper Family Ltd. P'ship,* 695 N.E.2d 135, 141 (Ind.Ct.App.1998). Rescission of a contract is defined as "the annulling, abrogating, or unmaking of a contract." *Van Bibber Homes Sales v. Marlow,* 778 N.E.2d 852, 857 (Ind.Ct.App.2002) (quoting *Yates–Cobb v. Hays,* 681 N.E.2d 729, 733 (Ind.Ct.App.1997)), *trans. denied.* "The remedy of contract rescission functions to restore the parties to their precontract position, that is, the status quo." *Id.* Rescission of a contract is not automatically available. *Barrington Mgmt.,* 695 N.E.2d at 141. However, if a breach of the contract is a material one which goes to the heart of the contract, rescission may be the proper remedy. *Id.* "A contract may be rescinded, warranting the need for equitable remedies, only when a party avers that he has performed a substantial part of his obligations under a contract and that the other party refused to perform its obligations." *Van Bibber,* 778 N.E.2d at 858 (citing *Yost v. McCarty,* 123 Ind.App. 288, 293, 108 N.E.2d 718, 721 (1952)). "[O]ne party will not be permitted by his or her own breach to create a condition which will tend to bring the other party into default then assert that such party's rights are forfeited by a default so caused." *Id.* (citing 17B C.J.S. Contracts § 473 (1999)). The party seeking rescission of a contract bears the burden of proving his right to rescind and his ability to return any property received under the contract. *Barrington Mgmt.,* 695 N.E.2d at 141.

■■■ Gabriel had the burden of demonstrating that she was entitled to rescission of the contract. To do so, Gabriel had to prove, in part, that Windsor materially breached the contract and refused to perform its obligations. On this issue, the trial court found:

8. There was no evidence that Windsor at any time refused to perform its obligations. In fact, Windsor's obligations were reaffirmed by the let-

---

1. Gabriel also argues that the failure to complete the residence within the time period set by the contract, the failure to install a window on top of the front door, the failure to center the kitchen light, the improper height of the laundry room desk, the improper design of the kitchen cabinets, the improper height of the vanity in the half-bath, and the incorrect countertop installed in the master bathroom were material breaches. However, Gabriel did not present these items to the trial court as material breaches. "A party may not advance a theory on appeal which was not originally raised at the trial court." *Van Meter v. Zimmer,* 697 N.E.2d 1281, 1283 (Ind.Ct.App. 1998). Consequently, these arguments are waived.

ters Gallmeyer sent on June 4th and 6th of 2003.

9. Subsequent to Gallmeyer's letters of June 4, 2003 and June 6, 2003, Windsor continued to perform its obligations pursuant to the Contract Documents and the agreements documented by such letters.

\*    \*    \*    \*    \*    \*

11. What is relevant under the applicable law is that Windsor did not in this phone conversation or at any other time in any way repudiate its obligations pursuant to the Construction Documents or Gallmeyer's letters.

12. It was Gabriel's burden to prove that Windsor repudiated its obligations and Gabriel wholly failed to meet this burden of proof.

13. Absent such a repudiation, case law is clear that Gabriel may not terminate her obligations under the Construction Agreement and rescind the purchase of the Residence.

14. Windsor did not commit a material breach of the Construction Agreement prior to Gabriel's purported termination.

Appellant's Appendix at 17–18.

Gabriel challenges these conclusions by arguing that Windsor told her in April 2003 that there was nothing wrong with the basement wall, that Windsor did not attempt to make a proper repair to the basement wall until late June 2003, and that Windsor failed to make the other corrections that she requested. However, Gabriel ignores the evidence supporting the trial court's findings and simply requests that we reweigh the evidence, which we cannot do.

At the trial, evidence was presented regarding meetings and letters between the parties in June 2003. After a meeting between the parties, Gabriel's counsel sent a letter to Windsor on June 4, 2003, which detailed the meeting:

Once again, thank you for the meeting with Ms. Gabriel and me regarding the pre-closing items. What follows is my understanding of agreements made at our meeting on June 3, 2003.

First, Windsor will construct a retaining wall with drainage pipe on the boundary line between Lot 5 and Lot 4. The purpose of the retaining wall is to retain and properly divert surface water and roof downspout water from Lot 4 and away from Lot 5. The wall will be faced and capped with stone acceptable to Ms. Gabriel.

Second, Windsor will remove the existing sidewalk running from the rear garage door to the patio and replace it with one 2½ feet wide in the configuration and location indicated by Ms. Gabriel and her landscape architect.

Third, a concrete step will be placed on the patio to access the rear sliding entry door.

Fourth, during construction, the front porch concrete became discolored. Ms. Gabriel does not want the front porch to be stained or painted. Her preference is some sort of paving material. Windsor did not agree to pave the front porch. Ms. Gabriel is going to get estimates for the cost of such paving. This is an open item.

Fifth, Windsor will coordinate with Ms. Gabriel's landscape architect in the placement of the new sidewalk.

Sixth, Windsor will provide a written warranty regarding a dry basement.

Gary, the above reflects my understanding of the agreements reached at our meeting. If I am in error, please let me know.

Appellee's Appendix at 13–14. On June 6, 2003, Gabriel's counsel sent the following letter to Windsor:

> The purpose of this letter is to correct errors in my letter to you of June 4, 2003. In my prior letter, I failed to list the following agreements made at our meeting on June 3, 2003.
>
> First, Windsor agreed to remove the concrete patio and replace it with one in the configuration and location indicated by Ms. Gabriel or her landscape architect.
>
> Second, Windsor agreed to replace the heater in the garage.
>
> Third, Windsor agreed to replace the insulation on the basement walls.
>
> For your information, Ms. Gabriel has obtained the following information regarding correcting the discoloration on the front porch. To have the porch paved with a brick paver would cost $650, but a brick paver would make the porch too high and out of compliance with code. To have the porch paved with a tile paver would cost $880, and the porch would be in compliance with code.
>
> Finally, as soon as you can get me title work we can schedule closing this transaction.

*Id.* at 15. Windsor also agreed to fix the closet issue by moving some ductwork and installing the closet.

The trial court also found that extremely wet weather prevented Windsor from excavating the basement to repair the leak until late June 2003 or early July 2003. Although Gabriel challenges these findings, there is evidence in the record to support the trial court's findings. *See* Transcript at 104–105, 176, 204–206, 210.

The trial court was presented with evidence that Windsor was working to resolve Gabriel's issues with the house. Winsdor had agreed to replace the garage heater, install a closet in the upstairs bedroom, replace the patio and sidewalk, construct a retaining wall to correct drainage between Lot 5 and Lot 4, and repair and warrant the basement wall. The sole remaining issue was the discoloration of the concrete on the front porch, which Windsor had agreed to stain but Gabriel wanted to pave.

Gabriel's basis for terminating the contract as stated in her June 23, 2003, letter was the leaking basement and the drainage issues between Lot 4 and Lot 5. However, as is evidenced above, the parties had reached agreements on those issues, and Windsor's completion of the repairs was simply delayed by the weather. Based upon the evidence presented at the trial, we cannot say the trial court's finding that Windsor did not refuse to perform its obligations under the contract is clearly erroneous.[2] Consequently, the trial court's findings that Gabriel could not rescind her purchase of the residence and terminate the contract are not clearly erroneous. The trial court did not err by granting judgment to Windsor and denying Gabriel's counterclaim. *See, e.g., Huff v. Biomet, Inc.,* 654 N.E.2d 830, 837 (Ind.Ct. App.1995) ("Huff does not set forth any facts which would indicate that Biomet refused performance of its obligations under the contract compelling rescission, and causing the need for an equitable remedy."), *abrogated on other grounds, St. Vin-*

---

**2.** We need not address Gabriel's remaining challenges to the findings of fact because Gabriel failed to show that Windsor refused to perform its obligations. However, we note that Gabriel's arguments regarding the remaining findings are merely requests that we reweigh the evidence, which we cannot do.

*cent Hosp. & Health Care Center, Inc. v. Steele,* 766 N.E.2d 699 (Ind.2002).

## II.

The next issue is whether the trial court's judgment granting specific performance is clearly erroneous. Specific performance is an equitable remedy that the trial court may grant in its discretion. *Hardin v. Hardin,* 795 N.E.2d 482, 486 (Ind.Ct.App.2003). A party seeking specific performance of a real estate contract must prove that he has substantially performed his contractual obligations or offered to do so. *Id.* at 487. The grant of specific performance directs the performance of a contract according to the terms agreed upon. *Id.* at 486–487. To give a trial court jurisdiction to order specific performance of a contract, the contract must be "capable of being specifically enforced and of such nature the court can decree its complete performance against both parties without adding to its terms." *Becker v. MacDonald,* 488 N.E.2d 729, 733–734 (Ind.Ct.App.1986) (citing *Risk v. Thompson,* 237 Ind. 642, 652, 147 N.E.2d 540, 545 (1958)), *reh'g granted on other grounds,* 491 N.E.2d 210 (Ind.Ct.App. 1986), *trans. denied.* A court may not substitute its own ideas for any of the terms or conditions of the contract. *Id.*

Gabriel argues that the trial court abused its discretion by ordering specific performance because the trial court ordered Winsdor to convey a drainage easement across Lot 5 to the owners of Lot 4 and the drainage easement was not part of Gabriel's original agreement with Windsor.[3] We must agree. The trial court found that "[a]fter removing the retaining wall, Windsor completed the grading of the Lot 5 and installed an underground drain into which water from Lot 5 and Lot 4 is discharged as referenced in Gallmeyer's letter of June 4, 2003, which drain will not affect Gabriel's enjoyment of the Residence." Appellant's Appendix at 16. The trial court concluded that "[a]lthough the drain tile installed on Lot 5 which services both Lot 5 and Lot 4 will not impair Gabriel's enjoyment of the Residence, Windsor should convey to the owners of Lot 4 an easement for drainage into said tile so that the issue is wholly resolved." *Id.* at 18. The trial court then ordered Windsor to "convey Lot 5 by Corporate Warranty Deed to Gabriel subject to the drainage easement as referenced below and furnish the customary Closing Affidavit." *Id.*

The drainage easement was not a term of the parties' contract, and in ordering Windsor to convey the property to Gabriel subject to the drainage easement, the trial court impermissibly added a term to the contract. Consequently, we reverse the trial court's grant of specific performance and remand for further proceedings.[4] *See,*

---

3. Gabriel also argues that the trial court abused its discretion by ordering her to pay $17,018.45 in excess of the original contract price. Gabriel ignores the fact that this amount is based upon change orders signed by her and overages on allowances, such as cabinets, that she picked. *See* Joint Exhibit W. Consequently, we cannot say that the trial court abused its discretion by ordering Gabriel to pay this amount.

Gabriel also argues that the trial court abused its discretion by failing to require Windsor to remedy the sidewalk, patio, and closet issues. Windsor concedes it agreed to replace the sidewalk and patio. Appellee's Brief at 20–21. Further, during testimony, Windsor's president testified that he had agreed to fix the closet issue. Transcript at 103. The trial court should address these issues on remand in considering the damages award.

4. Because we are reversing the grant of specific performance due to the drainage easement, we need not address Gabriel's argument that the trial court erred by requiring

*e.g., Becker,* 488 N.E.2d at 734 (holding that the trial court erred by ordering the payment of insurance and taxes as part of specific performance where the insurance and taxes were not terms of the contract). On remand, the trial court should consider an award of damages rather than specific performance. *See, e.g., Kesler v. Marshall,* 792 N.E.2d 893, 897 (Ind.Ct.App. 2003) (holding that, rather than specific performance, the vendor of real property could have kept the purchaser's earnest money and terminated the contract or resold the property and held the purchaser liable for the difference between the actual sale price and the price under the contract where the purchaser failed to perform the contract), *reh'g denied, trans. denied.*

## III.

■ The final issue is whether the trial court's judgment in favor of Windsor in the amount of $2,383.41 is clearly erroneous. The trial court ordered that Windsor recover judgment against Gabriel in the amount of $2,383.41 plus interest and insurance. Gabriel argues that the judgment is not supported by the findings because the trial court made no findings on this issue. While Gabriel is correct that the judgment is clearly erroneous because the findings do not address these damages, Gabriel fails to mention that evidence was presented in support of this amount of damages. *See* Joint Exhibit FFF (detailing utilities and insurance paid by Windsor and insurance and interest accruing). *See, e.g., Hvidston v. Eastridge,* 591 N.E.2d 566, 568 (Ind.Ct.App.1992) ("The judgment will be reversed only when clearly erroneous, i.e., when the judgment is unsupported by the findings of fact and conclusions of law entered on the findings."). We reverse the award of these damages, but

on remand, the trial court may consider these damages in its judgment.

## IV.

■ Windsor also argues that it is entitled to appellate attorney fees due to Gabriel's procedural bad faith. Ind. Appellate Rule 66(E) provides that this court "may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees." Bad faith on appeal may be classified as "substantive" or "procedural." *Wallace v. Rosen,* 765 N.E.2d 192, 201 (Ind.Ct.App.2002). Substantive bad faith "implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Id.* Procedural bad faith "is present when a party flagrantly disregards the form and content requirements of the Rules of Appellate Procedure, omits and misstates relevant facts appearing in the record, and files briefs appearing to have been written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court." *Id.* Windsor argues that Gabriel's failure to present her statement of facts in accordance with the appropriate standard of review, reference to deceit and deception on the part of Windsor without supporting evidence, and failure to apply the appropriate standard of review amount to procedural bad faith.

■ We agree that Gabriel failed to present the facts supporting the trial court's judgment and, instead, presented only the facts supporting her arguments. Many of Gabriel's arguments also amounted to a request that we reweigh the evidence, which we cannot do. However, Gabriel's brief does not appear to be "written in manner calculated to require the maxi-

Windsor to convey the drainage easement to the owners of Lot 4.

mum expenditure of time both by the opposing party and the reviewing court." *Graycor Industrial v. Metz*, 806 N.E.2d 791, 801 (Ind.Ct.App.2004), *trans. denied.* Thus, we conclude that an award of appellate attorney's fees is not appropriate here. *See, e.g., id.* (holding that the appellee was not entitled to appellate attorney fees even though the appellant's brief did not appropriately conform to the appellate rules, did not set out the facts in accordance with the standard of review, set out facts incorrectly, and based arguments upon less than a full consideration of the evidence presented at the hearing).

For the foregoing reasons, we affirm the trial court's judgment in favor of Windsor and against Gabriel on her counterclaim but reverse the trial court's grant of specific performance and remand for a determination of damages for Gabriel's failure to perform the contract.

Affirmed in part, reversed in part, and remanded.

RILEY, J., and BARNES, J., concur.