**Robert HREZO, Hrezo Engineering, Inc., and East High Street Properties LLC, Appellants–Plaintiffs,**

v.

**CITY OF LAWRENCEBURG and Lawrenceburg Redevelopment Commission, Appellees/Cross–Appellants–Defendants.**

No. 15A01–0907–CV–338.

Court of Appeals of Indiana.

Sept. 30, 2010.

 
 

 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 
 

 
 
 
 
 
 

 
 
 
 
 
 
 
 
 

Leanna Weissman, Lawrenceburg, IN, Attorney for Appellants.

Susan M. Salyer, Patsfall, Yeager & Pflum, Cincinnati, OH, Attorney for Appellees.

## OPINION

BROWN, Judge.

Robert Hrezo, Hrezo Engineering, Inc., and East High Street Properties LLC (collectively, "Hrezo") appeal the trial court's grant of partial summary judgment in favor of the City of Lawrenceburg and the Lawrenceburg Redevelopment Commission[1] ("LRC," and collectively, the "City"). Hrezo raises two issues, which we consolidate and restate as whether the trial court erred in granting the City's motion for partial summary judgment regarding Hrezo's breach of contract claim.

■ On cross appeal, the City raises two issues, which we revise and restate as:

II. Whether the trial court erred in denying the City's motion for summary judgment regarding Hrezo's claim of promissory estoppel;[2] and

III. Whether the trial court erred by denying the City's motion for a bench trial.[3]

We affirm in part and reverse in part.

The relevant facts as designated by the parties follow. On April 11, 2003, Hrezo sent a letter and proposal to Tom Steidel, the City Manager for the City, in which Hrezo formally proposed to purchase and

---

1. The LRC was formed pursuant to Ind.Code § 36–7–14 "for the purpose of rehabilitation or redevelopment of areas within its boundaries...." Appellants' Appendix at 279.

2. Hrezo in its reply brief argues that although the City "discussed this as a summary judgment issue, the case has already proceeded to trial.... Because trial has already occurred, [the City's] claim of error is more properly seen as an attack on the sufficiency of the evidence tendered at that trial." Appellants' Reply Brief at 10–11. However, the denial of summary judgment is an interlocutory matter, and a claimed error in an interlocutory order "may be raised on appeal from the final judgment." *Trinity Baptist Church v. Howard,* 869 N.E.2d 1225, 1227 (Ind.Ct.App.2007).

3. The City references in its brief a "motion to strike the plaintiffs' jury demand." Appellees' Brief at 9. However, a copy of a motion to strike is not contained in the record.

redevelop the McCullough Drug Company Building (the "McCullough Building") "with the intention of assisting the community of Lawrenceburg with the Riverfront revitalization effort .... in accordance with the guidelines defined by the Historic Landmarks Foundation of Indiana consent agreement." Appellants' Appendix at 76. Hrezo's proposal was submitted to the City, and on May 19, 2003, the City passed Resolution 6–2003, which stated:

> WHEREAS, Hrezo Engineering has approached the City with an offer to purchase the building commonly known as the McCullock [sic] Drugstore Building on High Street in Lawrenceburg, Indiana for Fifty Thousand Dollars ($50,000.00) with plans to upgrade and completely rehabilitate the distressed structure and create four loft apartments, four office suites, and a first-floor commercial area with a parking lot in the rear of the building.

> WHEREAS, Hrezo Engineering is seeking a loan from the Lawrenceburg Bond Bank in the amount of Five Hundred Fifty Thousand Dollars ($550,-000.00) short-term loan to upgrade and refurbish the structure with the design and plans all in satisfaction of HLFI requirements.

> WHEREAS, the purpose of this project fits with the general redevelopment plan of downtown Lawrenceburg and will be a benefit to the citizens of Lawrenceburg.

> NOW, THEREFORE, BE IT RESOLVED BY THE COMMON COUNCIL OF THE CITY OF LAWRENCEBURG, INDIANA, THAT:

> The City Council is in approval of the basic terms of this project and requests that the matter be turned over to the Lawrenceburg Bond Bank to further develop the specific requirements of the plan.

*Id.* at 97. On August 4, 2003, the council passed Resolution 15–2003, which contained identical language except that the Resolution added the following as a second paragraph: "WHEREAS, Hrezo Engineering also offers to purchase the building on the corner of Short and High Streets currently being used by RSVP for the sum of $50,000." *Id.* at 153. Thus, the RSVP Building was added to the overall development proposal.

Upon the approval of the resolutions, Hrezo and the City, through Steidel, began to negotiate a "Development Agreement" which contained a provision stating that it would embody "the entire agreement and understanding of the parties ... and supersede [ ] all prior agreements, correspondence, arrangements and understandings relating to the subject matter hereof."[4] *Id.* at 255; *see also id.* at 166.

---

**4.** In Steidel's affidavit accompanying the City's summary judgment motion, Steidel states that "[a] City Council resolution approving a development proposal gives [Steidel] authority to negotiate for a Development Agreement with the entity making the proposal," that a "resolution approving a development proposal does not bind the City to complete a Development Agreement, nor does it bind the entity making the proposal into going forward with a development project," that "[t]here are occasions in which [the] City Council approves a proposal, but a Development Agreement is not reached," and that "the City and Mr. Hrezo never reached a Development Agreement." Appellants' Appendix at 113.

Mayor William Cunningham in his affidavit stated that "[t]he City treats Development Agreements as binding contracts. Resolutions passed by [the] City Council or the [LRC] merely give approval to the City to proceed with business. Such Business includes negotiating and entering into contracts." *Id.* at 293. Also, the Mayor's affidavit stated that "[n]ot all proposals that are approved ... lead to Development Agreements" and that "[i]f the City reached a Development Agreement with Hrezo Engi-

Over the course of the negotiations, the parties disagreed over who should bear the cost of replacing the roof on the McCullough Building. Hrezo pointed to a Third Amended Consent Judgment between the Historical Landmarks Foundation of Indiana ("HLFI") and the City, dated August 21, 2002, which required that "[w]ithin 90 days after the rear wall has been reconstructed, the City shall cause a new roof to be installed on the [McCullough Building], at the City's expense."[5] *Id.* at 177. After the rear wall was completed, however, the City did not construct the new roof. *Id.* at 184.

Hrezo's position, citing the Third Amended Consent Judgment and the proposal that it had submitted to Steidel and the City, was that Hrezo would pay "the difference in cost between installing a new roof on the McCullough Building using shingles and installing a new roof on the McCullough Building using a metal roof." *Id.* at 187. The City, on the other hand, wanted Hrezo to bear some of the cost in the roof's repairs irrespective of the upgrade.[6] Hrezo and the City also disagreed about inserting a "prevailing wage" clause into the Development Agreement per the Mayor's request. *Id.* at 99, 292.

In December 2004, Robert Hrezo and his son and employee Mike Hrezo met with city officials Mayor Cunningham, City Attorney Joseph Votaw, and Steidel. An updated version of Hrezo's development plan involving multiple properties including the "McCullough Drug Building, RSVP Building, the Hoerst Building, and a vacant lot" was discussed. *Id.* at 193. Afterwards, Steidel sent a draft of an agreement to Hrezo which, according to Hrezo, "was not consistent with what had been agreed to at the meeting in December, 2004." *Id.* at 194. Hrezo then informed the Mayor that it "was now going to return to the original plan of redeveloping the McCullough Building...." *Id.*

A Development Agreement was never signed by Hrezo and the City. Also, Hrezo did not provide the Bond Bank with all of the "necessary financial information" which was needed "in order to process the loan he requested for redevelopment."[7]

neering, City Council would approve the Development Agreement and I would sign it. That did not happen in this case." *Id.*

5. In the consent judgment, the HLFI promised to contribute "$50,000 or the bid amount, whichever is less, to restore the building's rear wall." Appellants' Appendix at 176.

6. We note that it is unclear from the designated evidence the exact the amounts that were being discussed. For example, City Attorney Joseph Votaw, in his deposition, testified about a meeting he had with Hrezo in July 2005:

And the meeting that [Hrezo] and I had was about what, if anything, [Hrezo] should be taking responsibility for below the roof, let's just say below the roof, the bad wood. And I was trying to get [Hrezo] to pay for, I think it was around $34,000 worth of those repairs which were enumerated and, as not being part of the roof itself. And that was

the difference. I think he was at 20 and we were at 34, and that's when the impasse came.

Appellants' Appendix at 105. Steidel, at a meeting of the LRC on July 11, 2005, stated that Hrezo "was o.k." with the City covering $21,000 "for the roof repair and now [Hrezo] wants more," and that the "$21,000 was in every one of the agreements and now it is not enough." *Id.* at 111, 112.

7. Steidel stated in his affidavit: "When the Bond Bank played a role in city development, the entity making the development proposal had to obtain loan approval from the Bond Bank before a Development Agreement could be signed." Appellants' Appendix at 114. Also, we note that at the work session of the LRC on July 27, 2005, Robert Hrezo stated to the commission that Hrezo's application had been submitted to the Bond Bank in "July 2005 and [a] meeting is coming up in August 2005." *Id.* at 146.

*Id.* at 108. On July 11, 2005, the LRC held a meeting in which Hrezo was not present and discussed, among other matters, the Hrezo development project. At the meeting, Votaw noted that "[t]he Mayor gave [Hrezo] 11 (eleven) days—if no reply Mayor will give Mr. Steidel the go ahead to sell the buildings." *Id.* at 262. Steidel stated that Hrezo "keeps changing his deals." *Id.* Another member of the LRC, Tom Rogers, stated that Hrezo "is not doing things positive and he should be here getting things done." *Id.* Steidel advocated putting the McCullough building "back on the market." *Id.* at 263.

On July 27, 2005, "as a result of the 11 day deadline expiring," the LRC held a "work session" to discuss the Hrezo project. *Id.* at 292. At the meeting, the LRC discussed its frustrations with Hrezo and the fact that the project had been held up for two years. Robert Hrezo explained to the LRC that he believed that the problem was the "City manager and the agreement," and that Hrezo had "asked for the matter to be turned over to the city attorney and it was in February he began working with [Hrezo]." *Id.* at 146. Votaw stated in clarifying the issue that:

> Bob [Hrezo] is correct that it was passed by council in November of 2003. The hang up was we did not put the roof on according to consent—judgment. It was supposed to be done in 2002. Bob wanted to pay to upgrade to a tin roof. He did have estimates. Roof would be $21,000.00. Bad wood work $13,000.00. Total cost $34,000.00 with upgrade in 2003. Since that time, in 2004 Bob came forward with another plan which included the RSVP building and the empty lot.

*Id.* at 147. Steidel stated that "[t]he real issue is—in 2003 we decided we were going to pay $21000 for the roof.... The city has poured millions into these few blocks...." *Id.* at 148. Robert Hrezo insisted that "[t]he roof was in the proposal," and that "[e]verything was well known." *Id.* The LRC voted to "withdraw the Hrezo proposal for the lack of agreement and offer the three buildings to the highest bidder." *Id.* at 149.

On August 16, 2005, Hrezo filed a complaint with jury demand in the Dearborn Circuit Court against the City asserting claims of breach of contract for the sale of the McCullough and RSVP buildings and promissory estoppel, in which Hrezo claimed reliance damages based upon "submit[ing] design plans, form[ing] a new legal entity, devot[ing] time, effort and [choosing] to forego other opportunities,[8] appl[ying] for a liquor license and engag[ing] the services of various professionals." *Id.* at 22. On September 2, 2008, the City filed a motion for summary judgment on both counts. On October 3, 2008, Hrezo timely filed a memorandum in opposition to summary judgment and accompanying designation of evidence. On December 15, 2008, the trial court granted the City's motion for summary judgment on Hrezo's breach of contract claim and denied summary judgment on Hrezo's promissory estoppel claim. On January 12, 2009, Hrezo filed a motion to reconsider which the trial court denied on January 20, 2009.

On April 14, 2009, the City moved for a bench trial "rather than to a jury pursuant to Indiana Trial Rule 38(A)" because the only remaining claim was for promissory estoppel which is "an equitable issue" and therefore "should not be tried to a jury." Appellees' Appendix at 1–2. On April 30, 2009, the trial court denied the City's mo-

---

**8.** Hrezo designated evidence that it was interested in pursuing a development project of the "Tanner Woods Condominium," which encompassed "16 condos to be built and revenue there from, and those were priced at 800 a month." Appellants' Appendix at 283.

tion. On May 4, 2009, a jury trial commenced, and on May 8, 2009, the jury returned a verdict in favor of Hrezo on its promissory estoppel claim in the sum of $45,536.25.

## I.

The issue raised by Hrezo on appeal is whether the trial court erred in granting the City's motion for partial summary judgment regarding Hrezo's breach of contract claim. When reviewing a grant of a motion for summary judgment, our standard of review is well-settled and is the same as it is for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *Wagner v. Yates*, 912 N.E.2d 805, 808 (Ind.2009). Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 39 (Ind.2002). All factual inferences must be construed in favor of the non-moving party, and all doubts as to the existence of a material issue must be resolved against the moving party. *Kovach v. Caligor Midwest*, 913 N.E.2d 193, 197 (Ind.2009), *reh'g denied.*

■ Hrezo argues that the City's Resolutions 6–2003 and 15–2003 (the "Resolutions") signed "by the clerk-treasurer and mayor" are sufficient to satisfy the three-part test for determining if a written document satisfies the Statute of Frauds. Appellants' Brief at 5. Indiana's Statute of Frauds provides in relevant part:

A person may not bring any of the following actions unless the promise, contract, or agreement on which the action is based, or a memorandum or note describing the promise, contract, or agreement on which the action is based, is in

writing and signed by the party against whom the action is brought or by the party's authorized agent:

\* \* \* \* \* \*

■ (4) An action involving any contract for the sale of land.

Ind.Code § 32–21–1–1(b). "The Statute is designed to preclude fraudulent claims which would probably arise when one person's word is pitted against another's...." *Johnson v. Sprague*, 614 N.E.2d 585, 588 (Ind.Ct.App.1993).

■ To satisfy the Statute, an enforceable contract for the sale of land must be evidenced by some writing: (1) which has been signed by the party against whom the contract is to be enforced or his authorized agent; (2) which describes with reasonable certainty each party and the land; and (3) which states with reasonable certainty the terms and conditions of the promises and by whom and to whom the promises were made. *Id.* Whether the undisputed language of a document constitutes a contract is a question of law. *Coca–Cola Co. v. Babyback's Intern., Inc.*, 841 N.E.2d 557, 562 (Ind.2006) (citing *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 721 n. 16 (Ind.1997)).

Here, the City does not dispute that the Resolutions were signed or that they describe with sufficient certainty the parties and the land. Rather, the City contends that the Resolutions fail to satisfy the third element because both Resolutions state that "[t]he City Council is in approval of the basic terms of this project and requests that the matter be turned over to the Lawrenceburg Bond Bank to further develop the specific requirements of the plan," and that the " 'specific requirements' of the plan were not merely inconsequential details as characterized by the Hrezo parties." Appellees' Brief at 4. Indeed, the City points out that "[t]his is

why the parties negotiated a Development Agreement for close to two years." *Id.*

Specifically, the City argues that, although Hrezo and the City "engaged in protracted negotiations about the potential sale and development of the McCullough Building and the RSVP Building," including "exchanging numerous drafts of a Development Agreement," the parties "never came to terms of the Development Agreement and never signed it." *Id.* at 3. Thus, the City argues that Hrezo is now trying to substitute the Resolutions for an agreement and that "[t]he proposed sale would not have given the Hrezo parties carte blanche control over the buildings." *Id.* at 4. Thus, "[i]n this case, it is not enough to simply say that because the parties, buildings and price can be identified that the terms of the contract are sufficient," because "[t]he missing terms would govern what the purchaser could do with the building after the purchase." *Id.* Indeed, these required conditions "were incorporated into the drafts of a Development Agreement that was being prepared by the City Manager while being negotiated between the parties." *Id.* at 4–5. Also, regarding the loan from the Bond Bank, "[n]o terms regarding the loan, including interest rates and length of the loan, are included in the Resolution[s]," and "when the Resolution[s] [were] passed by City Council, the Bond Bank had not received any financial documents from the Hrezo parties and had not agreed to the loan." *Id.*

In *Babyback's*, the Indiana Supreme Court examined whether a "faxed memo" from defendant Coca–Cola Enterprises, Inc. ("CCE") contained "the essential terms of the contract sufficient to satisfy the [Statute of Frauds'] requirement of a writing . . . ." *Babyback's*, 841 N.E.2d at 562. CCE argued that a multiple-year agreement alleged by Babyback's was un-

enforceable under the Statute of Frauds because it could not be performed within a year and no written contract was ever signed by the parties. *Id.* at 561. Specifically, CCE argued that the memorandum, faxed to Babyback's following a meeting between the parties, contained "no indication of a meeting of the minds" regarding certain terms which CCE felt were essential, and also that the memorandum indicated "that CCE did not intend to agree upon a contract with Babyback's and that the memo only reflected preliminary discussions." *Id.* at 562. Babyback's disputed both the lack of essential terms and also "CCE's claim that the memo demonstrates no contract was formed," and pointed "to various words and phrases in the memo such as 'we do agree,' 'alliance,' and 'agreed in principle.'" *Id.* at 562–563.

The Court concluded that "notwithstanding the memorialization of numerous details, the memo also specifies various other preliminary details remaining to be resolved. More importantly, the specific language and overall tenor of the memo unequivocally establish that no final agreement had been reached between CCE and Babyback's." *Id.* at 563. The Court highlighted that, in the faxed memorandum, CCE stated that:

> We enjoyed our meeting yesterday with you and believe we have made further strides toward coming to agreement on a 'quiet' partnership with your company. Your objectives however to have absolute agreement by Friday may be difficult to achieve. Nonetheless, we will move as quickly as possible given the complexities which must be worked through.

*Id.* (emphasis omitted). The Court also highlighted many of the terms which were contained in the memorandum, including that "CCE will pay Babyback's up front on an annual basis," "[p]er our conversation

today, [Babyback's is] to send to CCE ... a listing of approximately 2000 stores.... The list will provide a date by which the units can be placed," and "after reviewing the above items with our legal counsel and our chief financial officer, it is clear that we will need an audited financial statement from Babyback's in order to proceed with the transaction." *Id.* at 563–564. The Court also concluded that "[w]e need not evaluate the parties' claims regarding the presence or absence of specific terms of the alleged agreement because it is clear that the writing constitutes only preliminary negotiations and does not establish that the parties had reached a final contract." *Id.* at 565.

Similarly, here we find that it is clear that the Resolutions represent only preliminary negotiations and do not signify a final, written contract between Hrezo and the City. As noted above, the Resolutions note that "Hrezo Engineering *is seeking* a loan from the Lawrenceburg Bond Bank in the amount of Five Hundred Fifty Thousand Dollars ($550,000.00)" and that "[t]he City Council is in approval of the basic terms of this project and requests that the matter be *turned over to the Lawrenceburg Bond Bank to further develop the specific requirements of the plan.*" Appellants' Appendix at 97, 153 (emphasis add-

ed). This conclusion is further evidenced by the fact that the parties continued to work for two years on signing a Development Agreement, but that such an agreement was never signed. We acknowledge that, just as in *Babyback's*, there was some language in the Resolutions which could be read as evidencing an agreement, notably the statement that "[t]he City Council is in approval of the basic terms of this project," *id.* at 97, 153, however, we find such language is more akin to the "agreed in principle" language contained in the faxed memorandum described in *Babyback's*. Accordingly, we conclude that the tenor of the Resolutions establish that no final agreement had been reached between Hrezo and the City, that the writing does not satisfy the Statute of Frauds, and that therefore the trial court did not err in granting summary judgment to the City on this issue.[9]

## II.

The first issue on cross-appeal is whether the trial court erred in denying the City's motion for summary judgment regarding Hrezo's claim of promissory estoppel. As noted above in reviewing the trial court's grant of summary judgment, we similarly review the trial court's denial of

---

9. Hrezo also argues that "even assuming arguendo the document was not complete enough to satisfy the Statute of Frauds," exceptions to the parol evidence rule apply in this case which allows parol evidence to be considered, and that therefore the trial court could have considered the proposal Hrezo submitted to the City as further evidence for "specific details of the deal." Appellants' Brief at 13–14. We note, however, that "before any of this other evidence may be considered, the threshold issue—whether an agreement was satisfactorily reduced to a writing—must be resolved because an agreement required to be in writing must completely contain the essential terms without resort to parol evidence in order to be en-

forceable." *Babyback's*, 841 N.E.2d at 565 (citing *Ward v. Potts*, 228 Ind. 228, 234, 91 N.E.2d 643, 645 (1950); *Nat'l By–Products, Inc. v. Ladd*, 555 N.E.2d 518, 520 (Ind.Ct. App.1990)). Thus, because we conclude that the Resolutions represent only preliminary negotiations rather than a final, binding agreement, we need not address whether Hrezo's proposal may be examined as parol evidence of specific terms of an agreement between Hrezo and the City.

Also, the City argues that "[i]f the Resolutions form a contract, it contains a condition precedent." Appellees' Brief at 7. However, because we find that the Resolutions do not satisfy the Statute of Frauds, we need not address the City's argument.

summary judgment; that is, we stand in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley,* 891 N.E.2d 604, 607 (Ind.Ct.App.2008), *trans. denied.* Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* at 607–608. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id.* at 608. The party appealing from a summary judgment decision has the burden of persuading this court that the grant or denial of summary judgment was erroneous. *Knoebel v. Clark County Superior Court No. 1,* 901 N.E.2d 529, 531–532 (Ind.Ct. App.2009).

Because we find that the Resolutions were not sufficient to satisfy the writing requirement under the Statute of Frauds, we must evaluate whether there exists a genuine issue of material fact as to whether the City was nevertheless bound by an oral promise allowing for the application of promissory estoppel. The City argues that "[a] claim of estoppel does not operate to remove a case from a Statute of Frauds where the promise relied upon is the very promise that the Statute declares unenforceable if not in writing" because it would render the Statute "a meaningless dead letter as promissory estoppel could always be used to avoid the requirements of the Statute of Frauds." Appellees' Brief at 12–13 (citing *Ohio Valley Plastics v. National City Bank,* 687 N.E.2d 260, 264 (Ind.Ct.App.1997), *trans. denied; Whi-*

*teco Indus. v. Kopani,* 514 N.E.2d 840, 845 (Ind.Ct.App.1987), *trans. denied* ). The City argues that it "did not make a promise of a 'definite and substantial nature,' " because "[t]he Resolution clearly states that the specific requirements of the plan needed further development with the Bond Bank." *Id.* at 13. The City also argues that for Hrezo to prevail on its promissory estoppel claim it needs to show that it was subject to the "infliction of an unjust and unconscionable injury and loss," but that "[i]n this case, all of the losses claimed by the Hrezo parties are things that they would have given up if the project had gone forward." *Id.* at 15 (quoting *Brown v. Branch,* 758 N.E.2d 48, 52 (Ind.2001)).

Hrezo argues[10] that "it is telling that [the City] felt the need to take a vote to remove the project from the Hrezo parties. Clearly [the City] recognized the Hrezo parties had enforceable rights that went beyond mere negotiations, otherwise a vote would not have been required." Appellants' Reply Brief at 13. Hrezo argues that "the two-year long communications between Hrezo and [the City] showed something more had happened here." *Id.* at 13–14.

"Oral promises that are not enforceable under the Statute of Frauds may nonetheless be enforced under the equitable doctrine of promissory estoppel." *Babyback's.* 841 N.E.2d at 568 (citing *Brown,* 758 N.E.2d at 51). As articulated in *Babyback's,* prior cases have examined "the 'problem' when 'it is the very promise which the statute declares unenforceable that the [plaintiffs] assert should remove

---

10. As mentioned in note 2, Hrezo erroneously argued that although the City "discussed this as a summary judgment issue, the case has already proceeded to trial" and that "[b]ecause trial has already occurred, [the City's] claim of error is more properly seen as an attack on the sufficiency of the evidence ten-

dered at that trial." Appellants' Reply Brief at 10–11. Consequently, many of Hrezo's arguments rely on the transcript of the bench trial. On appeal, we will examine Hrezo's arguments only to the extent that they are based upon the designated evidence. Ind. Trial Rule 56(C).

their claim from the statute's operation.'" *Id.* (quoting *Whiteco,* 514 N.E.2d at 844). The Court explained:

> In *Ohio Valley Plastics v. Nat'l City Bank,* 687 N.E.2d 260, 264 (Ind.Ct.App. 1997), the court emphasized as "well-settled authority, that a claim of estoppel or fraud will not operate to remove a case from the Statute of Frauds where the promise relied upon is the very promise that the Statute declares unenforceable if not in writing." As explained in *Whiteco:*
>
>> Were this not the rule the statute would be rendered virtually meaningless because the frustrated claimant would always assert an oral promise/agreement to defeat by means of estoppel the statute's requirement for a written one. The contest would then concern the credibility of the evidence of an oral promise or agreement. That, of course, is precisely what the statute seeks to avoid.

*Id.* at 568–569 (quoting *Whiteco,* 514 N.E.2d at 844). The Court explained that this rule is more restrictive than Section 139 of the Restatement of Contracts, which "advocates greater limits upon the Statute of Frauds." *Id.* at 569.

■ A party seeking to defeat a defendant's Statute of Frauds defense based upon promissory estoppel must establish the following elements: "1) a promise by the promissor; 2) made with the expectation that the promisee will rely thereon; 3) which induces reasonable reliance by the promisee; 4) of a definite and substantial nature; and 5) injustice can be avoided only by enforcement of the promise." *Spring Hill Developers, Inc. v. Arthur,* 879 N.E.2d 1095, 1100 (Ind.Ct.App.2008) (citing *First Nat. Bank of Logansport v. Logan Mfg. Co.,* 577 N.E.2d 949, 954 (Ind. 1991)). As noted above, the City argues that no genuine issue of material fact ex-

ists regarding the fourth and fifth elements of the test.

■ We first examine the fifth element. This court recently observed that "[t]his element creates a high bar for the party seeking to establish promissory estoppel." *Id.* at 1101. Indiana courts "have recognized the possibility of relief for 'injustice' in limited circumstances:"

> [I]n order to establish an estoppel to remove the case from the operation of the Statute of Frauds, the party must show [ ] that the other party's refusal to carry out the terms of the agreement has resulted not merely in a denial of the rights which the agreement was intended to confer, but the infliction of an unjust and unconscionable injury and loss.
>
> In other words, neither the benefit of the bargain itself, nor mere inconvenience, incidental expenses, etc. short of a reliance injury so substantial and independent as to constitute an unjust and unconscionable injury and loss are sufficient to remove the claim from the operation of the Statute of Frauds.

*Babyback's,* 841 N.E.2d at 569 (quoting *Brown,* 758 N.E.2d at 52 (quoting *Whiteco,* 514 N.E.2d at 845)). A successful party is entitled to reliance damages only; compensation may not be sought for expectancy injuries or restitution/quantum meruit based upon the use of promissory estoppel to defeat the Statute of Frauds. *Spring Hill,* 879 N.E.2d at 1103–1104. To establish that injustice can be avoided only through the enforcement of a defendant's promise, the plaintiff must show that its reliance injury is "1) independent from the benefit of the bargain and the resulting expenses and inconvenience; and 2) so substantial as to constitute an unjust and

unconscionable injury."[11] *Id.* at 1103.

In its complaint, Hrezo claimed reliance damages based upon its actions including "submit[ting] design plans, form[ing] a new legal entity, devot[ing] time, effort and [choosing] to forego other opportunities, appl[ying] for a liquor license and engag[ing] the services of various professionals." Appellants' Appendix at 22. The consequences cited by Hrezo as reliance damages all occurred as a result of Hrezo's attempts to arrive at an agreement with the City with respect to the development and are not independent from the benefit of the bargain and the resulting expenses and inconvenience, nor are they so substantial as to constitute an unjust and unconscionable injury. In so holding we find the Indiana Supreme Court's opinion in *Brown v. Branch,* cited by the City, instructive. In *Brown,* defendant Brown told Rhonda Branch, his "on-again, off-again" girlfriend, that "if she moved back to Indiana, Branch would 'always have'" the home that Brown had purchased and the couple had previously lived in. *Brown,* 758 N.E.2d at 50. Branch quit her job in Missouri, where she had recently moved, and moved back to Indiana and into the house owned by Brown. *Id.* After their relationship ended, Branch sued Brown "when he failed to convey" the house to her. *Id.* Following a bench trial, the trial court awarded the home to Branch. *Id.*

After first noting that "even when oral promises fall within the Statute of Frauds, they may be enforced under the doctrine

of promissory estoppel," the Court stated that "[i]f what the party gave up in reliance on an oral promise was no greater than what the party would have given up in any event, then the consideration is deemed insufficient to remove the oral promise from the operation of the Statute of Frauds." *Id.* at 51, 53. The Court observed that in *Whiteco,* this court held that "neither the actions involved in moving one's household to a new location nor the mere relinquishment of an existing employment are sufficient to constitute independent consideration." *Id.* at 53 (quoting *Whiteco,* 514 N.E.2d at 843–844). The Court noted that the underlying basis for this approach is that:

> [I]n moving and/or giving up her prior job, the employee is merely placing herself in a position to accept the new employment. There is no independent detriment to the employee because she would have had to do the same things in order to accept the job on any basis, and there is no independent benefit bestowed upon the employer.

*Id.* (quoting *Wior v. Anchor Indus., Inc.,* 669 N.E.2d 172, 176 (Ind.1996) (quoting *Ohio Table Pad Co. of Ind., Inc. v. Hogan,* 424 N.E.2d 144, 146 (Ind.Ct.App.1981)), *reh'g denied* ). The Court reversed the trial court, holding that while Branch "was inconvenienced as well as denied the benefit that Brown's promise was intended to confer," she "has not shown that her reliance on Brown's oral promise resulted in

---

**11.** As stated in *Spring Hill,* some decisions by panels of this court did not mention the *Whiteco* language "that the reliance injury must be 'so substantial and independent as to constitute an unjust and unconscionable injury and loss....'" *Spring Hill,* 879 N.E.2d at 1102–1103 (discussing *Hardin v. Hardin,* 795 N.E.2d 482, 488 (Ind.Ct.App.2003); *Tincher v. Greencastle Fed. Sav. Bank,* 580 N.E.2d 268 (Ind.Ct.App.1991); *and Tipton County Farm Bureau Coop. Ass'n. Inc. v. Hoover,* 475 N.E.2d 38 (Ind.Ct.App.1985), *reh'g denied, trans. denied* ). In *Spring Hill,* the court reiterated the Indiana Supreme Court's observation in *Babyback's* that transfer was not sought in each of these decisions and interpreted "these observations to mean that enforcement of the oral promise is justified only where the reliance injury [applies the *Whiteco* standard] and that opinions failing to apply this standard are disapproved." *Id.* at 1103.

the 'infliction of an unjust and unconscionable injury and loss' that would remove the promise from the operation of the Statute of Frauds." *Id.*

Here, as noted above Hrezo claimed reliance damages, including the drafting of design plans, the formation of a legal entity, the time and effort it devoted to the project, its application for a liquor license, its "engag[ing] the services of various professionals," and in foregoing other development opportunities, by promissory estoppel. Appellants' Appendix at 22. Like in *Brown,* Hrezo's dealings with the City on a project that never came to fruition inconvenienced Hrezo; however, such actions by Hrezo are actions it would have had to take in order to finalize the contract on any basis. Moreover, Hrezo does not point to any independent benefit bestowed upon the City by the actions Hrezo took in furtherance of the negotiations and planning. *See Brown,* 758 N.E.2d at 53 (noting that "there [was] no independent benefit bestowed upon the employer" in endorsing the Indiana approach that independent consideration must be found in order to maintain an action for promissory estoppel).

■■■ Also, even if we found that Hrezo satisfied the unjust and unconscionable injury and loss requirement, we do not believe that there is evidence in the record that the City made promises of a definite and substantial nature as required by the fourth element for demonstrating promissory estoppel. As noted in part I, both of the City's Resolutions stated that "[t]he City Council is in approval of the basic terms of this project and requests that the matter be turned over to the Lawrenceburg Bond Bank to further develop the specific requirements of the plan." *Id.* at 97, 153. From that point on, Hrezo and the City were involved in negotiations. In August 2003, Hrezo received a draft agree-

ment and made changes to some of its provisions. Although Hrezo was informed that the revisions would be made and the agreement would be signed, neither Hrezo nor the City subsequently signed any agreement. In the fall of 2004, a storm caused substantial damage to the McCullough Building, and the roof needed extensive repairs. Then, in December 2004, Hrezo met with City officials and "clarified exactly the plan for the properties...." *Id.* at 193. According to Hrezo, the January 2005 agreement drafted by the City "was not consistent with what had been agreed to at the meeting in December, 2004." *Id.* at 194. At that point, Hrezo informed the City that it was going to return to the original redevelopment plan. In his deposition, Robert Hrezo stated:

> Despite our understanding with the City, [the City Manager] continued to issue drafts of an agreement that were not consistent with our understanding. In addition, in 2005, for the first time, drafts of the proposal included a sharing of the cost of the roof. This was never something I agreed to. I was always consistent, as the proposal indicates that the cost of the roof was going to be the responsibility of the City as per the consent judgment. Now that the City had dragged its feet on repairing the roof and allowed the weather to worsen the conditions of the building, it appeared that the City was attempting to burden the plaintiffs with the cost of the roof. A quick review of the agreement from 2003 will show that there was never any discussion of cost-sharing with regard to the roof. Inexplicably, in 2005, [the City Manager] began insisting on a shared cost for the roof. This was never approved by the City Council and was never part of the proposal approved by City Council.

*Id.* at 194–195. In May 2005, Hrezo discussed entering into a lease with the City until an agreement was signed. In July 2005, Hrezo began negotiating with City Attorney Votaw instead of Steidel, the City Manager, because Steidel "suffered from an inability to set forth the agreement [Hrezo] had reached with the City...." *Id.* at 195. In July 2005, Hrezo informed the City that he "was anxious to have an agreement signed." *Id.* at 196. Hrezo attended a July 27, 2005 "work session" of the LRC because it was "anxious to complete negotiations and conclude the agreement." *Id.* At the work session, the LRC voted to end the negotiations with Hrezo and "withdraw the Hrezo proposal for the lack of agreement." *Id.* at 149. Thus, we conclude that the interactions between Hrezo and the City constituted the negotiations of an arm's length transaction which broke down because of a disagreement over financial terms, and over the course of those negotiations promises by the City of a definite and substantial nature were never made to Hrezo.[12]

For the foregoing reasons, we affirm the trial court's grant of the City's motion for summary judgment on Hrezo's breach of contract claim and reverse the trial court's denial of the City's motion for summary judgment on Hrezo's promissory estoppel claim.

Affirmed and reversed.

MATHIAS, J., and BARNES, J., concur.

---

12. Because we reverse the trial court's denial of summary judgment on Hrezo's promissory estoppel claim, we need not address the second issue raised on cross-appeal by the City of whether the trial court erred by denying the City's motion for a bench trial.