## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2017, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEES

Eric N. Allen
Thomas S. Bowman
Allen Wellman McNew Harvey, LLP
Greenfield, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Everett Quinton, <br> *Appellant-Defendant,* <br><br> v. <br><br> Christie Cain and The Estate of Roger Cain, <br> *Appellees-Plaintiffs.* | November 30, 2017 <br><br> Court of Appeals Case No. 24A01-1706-CC-1271 <br><br> Appeal from the Franklin Circuit Court <br><br> The Honorable J. Steven Cox, Judge <br><br> Trial Court Cause No. 24C01-1604-CC-216 |

**Kirsch, Judge.**

[1] Everett Quinton ("Quinton") entered into a contract with spouses Roger and Christie Cain (together "the Cains"), in which Quinton agreed to rent

approximately 100 acres of his farmland to the Cains, who paid an annual sum of cash rent and agreed to farm the land and raise crops. Following Roger's death, a dispute arose stemming from the contract, and Christie, in her individual capacity and as personal representative of the Estate of Roger Cain ("the Estate"), brought a breach of contract action against Quinton. Following a bench trial, the trial court determined that Quinton had breached the contract, and it entered judgment in favor of Christie and the Estate. Quinton now appeals and raises two issues, which we restate as:

> I. Whether the trial court's judgment in favor of the Estate was clearly erroneous; and

> II. Whether the trial court's determination of damages was supported by the evidence.

We affirm.

## Facts and Procedural History

On March 1, 2009, Quinton and the Cains entered into a Rental Contract ("the Contract"), in which Quinton rented to the Cains approximately 100 acres of his farmland in Franklin County, for the annual sum of $10,000.00, covering the period of March 1, 2009 to December 31, 2009; Quinton signed the Contract, and both Roger and Christie signed it as well. The Cains agreed "to manage and perform all labor in connection with the operation of said farms and agreed to cultivate and harvest the soybeans and corn crops thereon, all in a good and husbandlike manner and in accordance with the practices of good

farming." *Appellant's App. Vol. II* at 16.  The Contract renewed automatically "unless either party gives written notice by September 1."  *Id.* at 17.  Rent was to be paid by March 1 of each year.  The Contract also provided as follows:

> [The Cains] further covenant[] and agree[] that [they] will not re-lease or sublet said premises or any part thereof or will not assign this lease or any part thereof, without the written consent of [Quinton], and shall, at the expiration of the lease or upon the non-performance of said lease by [the Cains] or any of the covenants mentioned therein, deliver peaceable possession of said premises to [Quinton], upon demand of [Quinton.]

*Id.* at 16.  Although the Contract provided for rent in the sum of $10,000.00, the parties verbally agreed, at some point in past years, to an increase, such that the Cains paid $12,000.00 to rent the land.

[4]  The Cains continued to rent the land continuously since 2009, and they paid their rent in March 2015.  In October 2015, the Cains purchased $19,978.09 in fertilizer from Helena Chemical Company ("Helena Chemical") for the rented farmland.  The Cains provided barley seed to Helena Chemical, who applied the fertilizer and barley to the rented 100 acres in the fall of 2015, in preparation for the 2016 crops.[1]  At the Cains' request, Helena Chemical applied a "double spread," or "double spray," of the fertilizer, which, according to a Helena Chemical employee, provided "a nice even pattern [] for the field."  *Tr. Vol. II*

---

[1] The barley was not an income-producing crop; it was planted only as a "cover crop," spread with the fertilizer, intended to help improve the soil and reduce erosion concerns.  *Tr. Vol. II* at 19-20, 44.

at 30, 78; *Plaintiffs' Ex.* 3. On January 13, 2016, Roger died unexpectedly. His death occurred before the time for planting of the 2016 crops.

[5] The parties present differing versions of what happened thereafter. According to Christie, (1) she contacted Quinton by phone in late January 2016 and advised him that she intended to perform the obligations under the Contract, had found someone to farm the property for her in 2016, and would pay the rent by March 1, 2016; and (2) Quinton indicated to Christie that this arrangement would be "fine." *Tr. Vol. II* at 13. According to Quinton, (1) Christie told him that she did not intend to farm the property, as she did not have the money or farming knowledge to do so; (2) Christie did not pay or offer to pay the rent by March 1 as required by the Contract; and (3) therefore, Quinton rented the farmland to another individual on March 7, 2016.

[6] In April 2016, Christie, in her individual capacity and as the appointed personal representative of the Estate, brought a breach of contract action against Quinton, alleging that she and the Estate had a valid contract and that Quinton refused her offer to pay the March 2016 rent for the year 2016 and rented the land to someone else, thereby not allowing her "or her agent" to farm it, and that Quinton refused to refund the out-of-pocket fertilizer expenses. *Appellant's*

*App. Vol. II* at 14. Christie and the Estate sought as damages the $19,978.09 in fertilizer that had been applied to the property in the fall of 2015.[2]

[7] A bench trial was held on November 29, 2016, which was recessed and continued on February 23, 2017. At trial, Christie described the family's farming operation, stating that she did the paperwork, payroll, maintained records, obtained parts, and other non-farming tasks, while Roger "was the brains of the business" and did the farming. *Tr. Vol. II* at 11. The business planned to farm 3,500 acres in 2016, some owned and some rented. Christie said that Roger "firmly believed in fertilizing and doing a cover crop" to make "the ground [] worth more" and explained that the fertilizer and cover crop "went down [on the land] at the same time." *Id*. at 17-18. Christie testified to receiving and paying the invoice from Helena Chemical for the fertilizer, which had been placed on Quinton's land before Roger's death.

[8] Christie testified that, approximately two weeks after Roger's death, at the end of January, she began "calling all the [] landlords[,]" including Quinton, and she told him that she would be performing her obligations under the Contract, including paying the rent, and that she had "picked out someone to . . . be an agent to help [her]" with the farming, "and [Quinton] agreed. He said that was fine." *Id*. at 12-13, 16, 20. Christie stated that during her late-January phone

---

[2] The complaint also requested lost profits. *Appellant's App. Vol. II* at 14. However, Christie and the Estate later advised the trial court that they were "not seeking lost profits as damages," and were only seeking to recover the cost of the fertilizer. *Id.* at 22, 33.

call to Quinton, she advised Quinton that the fertilizer that the Cains put on his ground cost them approximately $20,000.00. *Id*. at 27. The person that Christie hired to farm the Quinton ground, and other rented ground, was Brad Tressler ("Tressler"). Christie testified that her arrangements with Tressler were as follows: Tressler would physically farm the ground on her behalf, pay the rent, reimburse her for the fertilizer, and later receive all the crop income. *Id*. at 18, 26. She stated that she made similar arrangements on other rented farms as well, and "this is the only farm that it didn't happen." *Id*. at 18.

[9] Tressler was the next to testify. He considered himself a "good friend" of Roger's, and he knew Christie, too. *Id*. at 28. Sometime after Roger's death, Christie contacted him and proposed that he assist her in the performance of at least a couple of farming contracts, including Quinton's. Like Christie, Tressler described the terms: He would pay the cash rent due on March 1 and pay Christie the amount of the fertilizer bill, "And then, whatever money [] was made off the farm, I would keep that[.]" *Id*. at 29.

[10] Tressler testified that he contacted Quinton by phone and arranged a date and time to come to Quinton's home to make the rent payment, recalling that, in that conversation, Quinton appeared to be aware and understood that Tressler was the person who "would be farming the farm" in place of Roger. *Id*. at 33, 45. Tressler went to Quinton's home near the end of February, bringing with him his own blank check. *Id*. at 45. Tressler described that they first engaged in some "small talk," because they did not know each other, and eventually Tressler told Quinton that he was there "to pay him." *Id*. at 33. Tressler was

aware the Cains and Quinton had agreed to an increase from the $10,000.00 Contract price to $12,000.00, and he was prepared to pay the $12,000.00.

[11] According to Tressler, Quinton expressed reluctance at accepting payment, indicating to Tressler that he was not who Quinton thought he was, and Quinton also told Tressler that he had received one or more offers from other farmers who were willing to pay $50 to $75 more per acre for the same land. Tressler testified that he told Quinton that he "would match whatever that person offered to pay him."[3] *Id.* at 34. Quinton indicated he needed some time to think about it, and Tressler left Quinton's house without paying. Before leaving, Tressler told Quinton that "there's a $19,000 fertilizer bill that somebody needs to pay Christie, [] if I don't farm it." *Id.* at 35. During his testimony, Tressler acknowledged that he was not a party to the Contract and had not received any assignment of Christie's rights under it, but, rather, was acting on her behalf when he was at Quinton's house. *Id.* at 40, 42, 47.

[12] Quinton also testified at trial. He stated that he attended Roger's visitation and funeral and that, when Christie saw him, she pointed at him, raised her voice, and said that he was one of "those landowners" who had been calling her and that she told Quinton that she would not be farming his ground because (1) she did not have the money to pay rent, (2) did not have money to buy fertilizer, (3)

---

[3] Tressler acknowledged that he had not received authority from Christie to renegotiate the Contract terms, but that he "just really wanted [] her to get that money for the fertilizer," so "if that's what it was gonna take, for me to pay the extra money, I was willing to do that." *Tr. Vol. II* at 39-40.

did not have anyone to do the work for her, and (4) she did not know how to farm herself. *Id.* at 52. Quinton testified that Christie called him a number of times in February and that in those calls he told her that the rent was due March 1, and "when she failed to pay it, the rent, I figured she broke the [C]ontract[,]" and he rented it to someone else, Dirk Ricke ("Ricke"), on March 7. *Id.* at 53.

[13]  As to Tressler's visit to Quinton's home, Quinton testified that Tressler did not offer him any payment for rent on the Contract, and, instead, Tressler (1) told Quinton that Christie had said that "somebody owed her the fertilize[r] money," and (2) indicated that he wanted to rent the land from Quinton. *Id.* at 55, 66. Quinton refused to pay for the fertilizer, as he never had done so before, and refused to "make a contract" with Tressler, telling Tressler, "[Christie]'s got a contract, and it's in effect til the 1st of March, and I don't want to discuss it anymore." *Id.* at 66. Quinton maintained that when he rented the property to Ricke on March 7, neither Christie nor Tressler had offered to pay him rent on the Contract. *Id.* at 57, 60-61. Upon cross-examination, Quinton acknowledged that Tressler told Quinton that he was at Quinton's house, "for Christie Cain[,]" but maintained that Tressler "never said anything about paying the rent[.]" *Id.* at 61, 64. Quinton rented the farmland to Ricke for $15,000.00 on March 7, but Quinton explained that he did not accept a check from Ricke until April "to give [Christie] a chance to [] pay the rent[.]" *Id.* at 64.

Christie stated that she had no recollection whether Quinton was at the visitation or funeral, and she did not recall any conversation with him. *Id.* at 27. Christie stated that she never spoke to Quinton in February because there was no need, as "I talked to him in January[;] the rent was due [] March 1st." *Id.* at 17. However, after she learned from Tressler that Quinton was not accepting the rent, Christie stated that she called Quinton six times between March 14 and March 18, reaching him only once. *Id.* at 22. She testified that she reviewed her phone bill but found no phone calls to or from Quinton in February 2016. *Id.*

Christie and the Estate (together "the Plaintiffs") requested that the trial court issue findings of fact and conclusions of law thereon. The trial court took the matter under advisement and issued Findings of Fact, Conclusions of Law, and Judgment ("Order") in May 2017. In its Order, the trial court found, among other things, that the Contract, due to its automatic renewal provisions, was in full force and effect in the winter of 2015 and spring of 2016; Christie hired Tressler to farm the ground for the crop year 2016, and she told Quinton that she would be performing the Contract and would be sending Tressler to pay the rent; Tressler contacted Quinton and went to Quinton's home "and was prepared to pay rent," but Quinton did not accept it. *Appellant's App. Vol. II* at 8-9. The trial court further found:

> 9. On March 7, 2016, [Quinton] entered into a new contract, for the same ground rented to [the Cains] under the [] Contract, with Dirk Ricke. At no time did he notify the Plaintiffs that he had

entered into a new contract, and by doing so was attempting to rescind the existing Rental Contract.

12. [Quinton]'s attempted rescission of the Rental Contract is invalid because he provided to the Plaintiffs no notice of default, he did not give the Plaintiffs an opportunity to cure the alleged default, and he failed to give the Plaintiffs any notice of his attempted rescission.

. . . .

14. While the attempted rescission of the Contract by [Quinton] was ineffective, if it were to be effective, [Quinton] would have been required to restore to the Plaintiffs everything of value that he had received from the Plaintiffs in anticipation of performing the Contract. That amount, not coincidentally, is the cost of the fertilizer or $19,978.09.

15. Regardless of whether [Quinton] breached the Contract or was justified in rescinding the Contract, the Plaintiffs are entitled to recover damages in the amount of $19,978.09.

*Id.* at 10-11. The trial court concluded that "the Plaintiffs did not voluntarily refuse or neglect to pay rent," "rescission was not available as a remedy to [Quinton,]" and Quinton "breached the Contract [] by failing to comply with Indiana statutory and case law regarding termination of lease agreements and rescission of contracts." *Id.* at 12. Quinton now appeals, seeking a reversal of the Order finding him in breach of contract, or, if we affirm the breach of contract determination, then a reduction in the damage award.

# Discussion and Decision

[16] Pursuant to the request of Christie and the Estate, the trial court entered Indiana Trial Rule 52(A) findings of fact and conclusions thereon. We may not set aside the findings or judgment unless they are clearly erroneous. *Gabriel v. Windsor, Inc.*, 843 N.E.2d 29, 44 (Ind. Ct. App. 2006). In our review, we first consider whether the evidence supports the factual findings. *Id*. Second, we consider whether the findings support the judgment. *Id*. "'Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference.'" *Id*. (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). We give due regard to the trial court's ability to assess the credibility of witnesses, and we do not reweigh the evidence. *Id*. Rather, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id*. While we defer substantially to findings of fact, we do not do so with conclusions of law, which are reviewed *de novo*. *Fraley v. Minger*, 829 N.E.2d 476, 482 (Ind. 2005). "'In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made.'" *Id*. (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)). A judgment is clearly erroneous if no evidence supports the findings, the findings do not support the judgment, or the trial court applied the wrong legal standard. *Abernathy v. Bertram,* 967 N.E.2d 510, 512 (Ind. Ct. App. 2012).

# I. Breach of Contract

[17] Quinton argues that Christie effectively either re-leased, sublet, or assigned her rights to Tressler, which was in violation of the Contract's provisions and allowed him to rent the land to someone else. Thus, he argues, the trial court erred when it found that he breached the Contract. In particular, Quinton challenges those portions of Finding Nos. 4, 5, and 8, which determined that Tressler was Christie's "agent" who went to Quinton's home to pay the rent "on behalf of" Christie and the Estate. *Appellant's App. Vol. II* at 9. Quinton's position is that, contrary to those Findings, the evidence was that Tressler would farm the land, would pay Quinton, and would retain profits from the crops; this arrangement, he argues, illustrates that Christie and Tressler "intended for this to be a lease assignment not an agency relationship." *Appellant's Br*. at 14. Keeping in mind that we consider the evidence most favorable to the judgment, we disagree with Quinton's assertion that Christie assigned or sublet the land to Tressler and that Tressler was not acting on Christie's behalf.

[18] Christie testified that she intended to perform on the Contract and told Quinton so in late January 2016 and made arrangements with Tressler to physically farm the land for her, sending him on her behalf to Quinton's home before March 1 to pay the rent due under the Contract, and when she learned from Tressler that Quinton would not accept it, she called him six times to try and reach him. Tressler testified that Christie did not assign the Contract to him, nor did he enter into any separate written contract with her, and he expressly stated that he

went to Quinton's home to pay the rent on Christie's behalf pursuant to the Contract. Thus, evidence supports the trial court's findings that Tressler, acting on Christie's behalf, went to Quinton's home and attempted to pay the rent due on the Contract. However, even assuming that Christie sublet the land to Tressler or assigned the Contract to him, as Quinton claims, the Contract does not automatically become void. Rather, the Contract provides:

> [The Cains] further covenant[] and agree[] that [they] will not re-lease or sublet said premises or any part thereof or will not assign this lease or any part thereof, without the written consent of [Quinton], and *shall, . . . upon the non-performance of said lease by [the Cains] or any of the covenants mentioned therein, deliver peaceable possession of said premises to [Quinton], upon demand of [Quinton.]*

*Appellant's App. Vol. II* at 16 (emphasis added). Thus, according to the terms of the Contract, if the Cains failed to perform "any of the covenants," the Cains – and later Christie and the Estate – were required to "deliver peaceable possession" of the land to Quinton upon his demand. *Id.* It is undisputed that Quinton never made any such demand for possession. Accordingly, we agree with the trial court that the Contract remained "in full force and effect . . . at all pertinent times[,]" and Quinton breached the Contract by renting the same land to Ricke. *Id.* at 8.

[19] Quinton also asserts that Christie failed to pay the rent, "and once she failed to pay the rent on time, Mr. Quinton was entitled to lease his land to whomever he pleased." *Appellant's Br.* at 19. Whether Christie and the Estate failed to pay rent was a disputed issue of fact at trial. That is, Christie stated that she told

Quinton several weeks after her husband's death that she intended to perform on the Contract, including paying the rent and having someone farm the land for her, and she sent Tressler over to Quinton's home on her behalf to pay the rent due on the Contract; Tressler testified that he went prepared to pay the rent, but that Quinton did not accept it. Quinton, on the other hand, maintained that "nobody" offered to pay him rent on the Contract. *Tr. Vol. II* at 57. The trial court chose to believe Christie's version, finding that Tressler, acting as Christie's agent, went to Quinton's home to pay the March 1 rent on Christie's behalf. To the extent that Quinton argues that Christie told him she would not be performing and never offered to pay him, he merely invites us to reweigh evidence and judge witness credibility, which we may not do. *Abernathy,* 967 N.E.2d at 513. Based on the foregoing, we conclude that the evidence supports the trial court's findings that Quinton breached the Contract by "refusing to accept the contracted for amount of rent, by attempting to renegotiate the rental amount, and by entering into the new contract with Dirk Ricke on March 7, 2016[,]" and the findings support the judgment in favor of Christie and the Estate. *Appellant's App. Vol. II* at 10.

## II. Damages

[20] The trial court's Order found that the Cains contracted with Helena Chemical to spread fertilizer and a cover crop on Quinton's land and that Christie and the Estate incurred out-of-pocket expenses in the amount of $19,978.09 "in anticipation of being able to farm the ground for the crop year 2016." *Id.* at 8, 10. Christie and the Estate sought and received a judgment against Quinton in

that amount, plus pre-judgment and post-judgment interest. *Id*. at 12. Quinton asks that, if we agree with the trial court on the breach of contract determination, we find that the award of damages was excessive and not supported by the evidence.

Our review of a trial court's award of damages is limited. *Abernathy*, 967 N.E.2d at 512. We affirm if the amount of damages is supported by evidence on the record, and we do not reweigh the evidence or judge the credibility of witnesses. *Id.* We consider only the evidence favorable to the award and affirm if the award is "within the scope of the evidence before the finder of fact." *Id.*

According to the record before us, the Cains hired Helena Chemical to apply $19,978.09 in fertilizer in or around October 2015. The Cains expended this sum on the reasonable expectation that they would farm the 100-acre tract in 2016. Due to Quinton's breach, Christie and the Estate were not able to do so, and the trial court found that Christie and the Estate were entitled to recover the cost of the fertilizer as damages for the breach. We find the trial court's damages determination was within the scope of the evidence before the trial court.

Affirmed.

Najam, J., and Brown, J., concur.